CROCKETT & MYERS, LTD., a Nevada Corporation, and J.R. Crockett, Jr., Esq., an individual, Plaintiffs,

v.

NAPIER, FITZGERALD & KIRBY, LLP, a New York limited liability law partnership, and Brian P. Fitzgerald, Esq., an individual, Defendants.

Napier, Fitzgerald & Kirby, LLP, a New York limited liability law partnership, and Brian P. Fitzgerald, Esq., an individual, Counterclaimants,

v.

Crockett & Myers, Ltd., a Nevada Corporation, and J.R. Crockett, Jr., Esq., an individual, Counterdefendants.

No. 2:05–CV–00877–PMP–PAL.

United States District Court, D. Nevada.

July 20, 2006.

Joice B. Nidy, Samuel S. Lionel, Lionel, Sawyer & Collins, Las Vegas, NV, for Plaintiffs/Counterdefendants.

Mark A. Hutchison, Scott A. Flinders, Las Vegas, NV, for Defendants/Counterclaimants.

## ORDER

PRO, Chief Judge.

Presently before this Court is Plaintiffs'/CounterDefendants' Motion to Dismiss Defendants'/CounterClaimants' Second Amended Counterclaim Pursuant to FRCP 12(b)(6) (Doc. # 46), filed on May 15, 2006. On June 16, 2006, Defendants/CounterClaimaints filed an Opposition to Plaintiffs'/CounterDefendants' Motion to Dismiss Second Amended Counterclaim Pursuant to FRCP 12(b)(6) (Doc. # 51). Plaintiffs/CounterDefendants filed a Reply (Doc. # 52) and a Request for Permission to Exceed Page Limitation for Reply Brief (Doc. # 53) on June 30, 2006.

## I. BACKGROUND

On January 15, 2001, Michael Nostro died while undergoing a CT scan-guided needle biopsy in Nevada. On or about June 5, 2001, Michael Nostro's wife, Wende Nostro retained Brian P. Fitzgerald, Esq., to investigate the death of her husband in Nevada and to determine whether a viable medical malpractice claim existed. Mr. Fitzgerald is an attorney licensed to practice law in the State of New York and a member of Napier Fitzgerald & Kirby, L.L.P., a limited liability law partnership engaged in the practice of law in New York.

On or about June 28, 2001, Mr. Fitzgerald contacted Nevada attorney J.R. Crockett, Jr., Esq., to participate in the investigation and evaluation of the Nostro medical malpractice claim. Mr. Crockett is a partner in Crockett & Myers, Ltd., a professional corporation engaged in the practice of law in Nevada.

This action arises from a dispute between Plaintiffs/Counterdefendants Crockett & Myers, Ltd., and J.R. Crockett, Jr., Esq., (collectively "Crockett"), and Defendants/Counterclaimants Napier, Fitzgerald & Kirby, L.L.P., and Brian P. Fitzgerald, Esq., (collectively "Fitzgerald"), regarding the division of contingent attorneys' fees recovered as a result of the Nostro litigation.

Fitzgerald alleges that sometime in June 2001, Crockett and Fitzgerald agreed that Crockett would represent Nostro at a contingency rate of 33 1/3% as opposed to Crockett's usual 40% rate. Additionally, Crockett and Fitzgerald agreed that Fitzgerald would act as co-counsel on the case, and Crockett and Fitzgerald would split equally all attorneys' fees. The Second Amended Counterclaim also asserts Crockett orally agreed to pay Fitzgerald a referral fee of 50% of the recovered fees. (Second Am. Countercl. [Doc. # 36] at ¶ 11.)

On August 13, 2001, Crockett, Fitzgerald, and Nostro signed an Attorney Retainer Agreement drafted by Crockett. (Pls.' Compl., Ex. 1.) Under the Retainer Agreement, the two law firms assumed joint responsibility for handling Nostro's and the estate's medical malpractice claims. Additionally, the Retainer Agreement provided that Nostro would be responsible for all costs the attorneys advanced, with costs deducted after the contingency fee had been calculated. (Id.) The attorneys agreed to split equally advanced costs during the course of the litigation. (Id.) The Retainer Agreement contained the following provision:

All matters of policy, including but not limited to preparation and presentation of this claim, litigation, costs, possible settlement, trial and/or appeal, if the same shall arise, shall be determined jointly by the CLIENT and ATTORNEYS as reasonable as possible within

the professional discretion of ATTORNEYS and within the Canons of Ethics. (*Id.* (emphasis omitted).) Fitzgerald claims that his firm subsequently provided legal advice and service on the case, including gathering pertinent medical records, and researching various theories of liability. In July 2002, Crockett submitted the Nostro case to the then-existing Nevada Medical Legal Screening Panel, and on January 3, 2003, filed a complaint on behalf of Nostro in Nevada State Court.

Prior to June 2003, Nostro called Crockett about Fitzgerald's request that Nostro pay a share of the costs. (Second Am. Countercl. at ¶ 22.) During this call, Crockett advised Nostro "it was their policy not to go after a client for court costs and expenses," and that Nostro could fire Fitzgerald. (*Id.* at ¶ 23.) Crockett did not involve Fitzgerald in the discussion on costs. (*Id.* at ¶ 24.) On June 25, 2003, Wende Nostro sent a letter to Fitzgerald advising him that he and his law firm were discharged from any further representation on Nostro's behalf. (Pls.' Compl., Ex. 3.) Over a year later, Crockett negotiated a settlement of the Nostro case, and in accord with the Retainer Agreement, collected one-third of the settlement proceeds as contingent attorneys' fees.

By letter dated October 28, 2004, Crockett informed Fitzgerald of the settlement and further advised Fitzgerald that because Nostro had terminated Fitzgerald's representation before the settlement was reached, Fitzgerald was entitled only to quantum meruit compensation for the time he had worked on the matter. (Pls.' Compl., Ex. 6.) In response, Fitzgerald demanded payment of 50% of the recovered attorneys' fees under the Retainer Agreement, which Crockett has refused to pay.

On May 24, 2005, Crockett filed a Complaint in the Eighth Judicial District Court in and for the County of Clark, State of Nevada, seeking a declaration that Fitzgerald is entitled only to "a quantum meruit recovery for the hours they worked early on in the Nostro case ..." and for a monetary judgment to Fitzgerald consistent with a quantum meruit award. (Notice of Removal [Doc. # 1], Compl.) On July 20, 2005, Fitzgerald removed Crockett's action to this Court (Doc. # 1), and on July 27, 2005, filed an Answer and Counterclaim (Doc. # 3, # 4) alleging counterclaims for breach of contract, breach of the implied covenant of good faith and fair dealing, unjust enrichment, declaratory relief, and constructive trust. Crockett moved to dismiss the counterclaims, asserting Fitzgerald had no rights under the Retainer Agreement because Nostro had fired him, and that any alleged oral agreement for referral fees was unenforceable because it violated attorney ethics rules. The Court granted in part and denied in part the motion, ruling that because Nostro terminated the Retainer Agreement, Fitzgerald had no contractual right to enforce the fifty-fifty fee split under that Agreement. The Court permitted Fitzgerald to amend his Counterclaims to include specific allegations supporting the alleged oral referral fee arrangement, and suggested that because Nevada has not addressed the legality of referral fee agreements between attorneys, the Court was inclined to certify certain questions to the Nevada Supreme Court.

Defendants subsequently amended the Counterclaim to include allegations regarding the alleged oral referral fee agreement between himself and Crockett. (Defs.' Am. Answer & Countercl. [Doc. # 19].) In response to Plaintiffs' motion to dismiss the Amended Counterclaims (Doc. # 25), the Court ruled Nevada would enforce the alleged oral agreement between the two attorneys even if it violated Nevada public policy. (Order [Doc. # 35] dated April 20, 2006.) The Court further grant-

ed Defendants leave to amend the Counterclaim a second time. (*Id.*) Defendants filed Defendants' Second Amended Answer and Counterclaim (Doc. # 36), alleging breach of oral contract (count one); breach of the written Retainer Agreement (count two); tortious interference with contractual relations (count three); breach of the implied covenant of good faith and fair dealing (count four); joint venture (count five); unjust enrichment (count six); breach of fiduciary duty (count seven); declaratory relief (count eight); and constructive trust (count nine). Crockett now moves to dismiss counts one through seven and count nine, asserting various defects in each of these causes of action.

## II. LEGAL STANDARD

In considering a motion to dismiss, "all well-pleaded allegations of material fact are taken as true and construed in a light most favorable to the non-moving party." *Wyler Summit P'ship v. Turner Broad. Sys., Inc.,* 135 F.3d 658, 661 (9th Cir.1998) (citation omitted). However, the Court does not necessarily assume the truth of legal conclusions merely because they are cast in the form of factual allegations in the plaintiff's complaint. *See Clegg v. Cult Awareness Network,* 18 F.3d 752, 754–55 (9th Cir.1994). There is a strong presumption against dismissing an action for failure to state a claim. *See Gilligan v. Jamco Dev. Corp.,* 108 F.3d 246, 249 (9th Cir.1997) (citation omitted). The issue is not whether Plaintiff ultimately will prevail, but whether he may offer evidence in support of his claims. *See id.* at 249 (quoting *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 40 L.Ed.2d 90 (1974)). Consequently, the Court may not grant a motion to dismiss for failure to state a claim "unless it appears beyond doubt that the Plaintiff can prove no set of facts in support of his claim which would entitle him to relief." *Conley v. Gibson,* 355 U.S. 41, 45–46, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957);

*see also Hicks v. Small,* 69 F.3d 967, 969 (9th Cir.1995).

The liberal rules of notice pleading set forth in the Federal Rules of Civil Procedure do not require a plaintiff to set out in detail the facts supporting his claim. *See Yamaguchi v. United States Dep't of the Air Force,* 109 F.3d 1475, 1481 (9th Cir. 1997) (quoting *Conley v. Gibson,* 355 U.S. at 47, 78 S.Ct. 99). All the Rules require is a "short and plain statement" that adequately gives the defendant "fair notice of what the plaintiffs claim is and the grounds upon which it rests." *Id.* (citations and internal quotations omitted). A claim is sufficient if it shows that the plaintiff is entitled to any relief which the court can grant, even if the complaint asserts the wrong legal theory or asks for improper relief. *See United States v. Howell,* 318 F.2d 162, 166 (9th Cir.1963). On a motion to dismiss, the Court may consider a document to which the complaint refers if no party questions the document's authenticity. *Shwarz v. United States,* 234 F.3d 428, 435 (9th Cir.2000).

## III. DISCUSSION

■ "[F]ederal courts sitting in diversity apply state substantive law and federal procedural law." *Snead v. Metro. Prop. & Cas. Ins. Co.,* 237 F.3d 1080, 1090 (9th Cir.2001). Accordingly, Nevada substantive law controls in this case.

### A. Count One—Breach of the Oral Agreement

■ Count one of the Second Amended Counterclaims asserts the attorneys entered into an oral contract to divide equally attorneys' fees in the Nostro case and that Crockett breached this agreement by refusing to divide the fees equally. Crockett moves to dismiss this claim, arguing the parole evidence rule bars it because the written Retainer Agreement integrat-

ed the attorneys' fee split agreement. Fitzgerald responds the parol evidence rule does not apply because the oral and written contracts involved different parties, the oral contract does not vary from the written contract, and it is a question of fact whether the Retainer Agreement is complete and integrated.

 Parol, or extrinsic, evidence "is not admissible to add to, subtract from, vary, or contradict . . . written instruments which . . . are contractual in nature and which are valid, complete, unambiguous, and unaffected by accident or mistake." *Ringle v. Bruton,* 120 Nev. 82, 86 P.3d 1032, 1037–38 (2004). This rule, known as the parol evidence rule, provides that prior negotiations and agreements merge in the written contract, and parol evidence is not admissible to vary or contradict the written agreement's terms. *Tallman v. First Nat'l Bank of Nev.,* 66 Nev. 248, 208 P.2d 302, 306 (1949). The parol evidence rule is not just an evidentiary rule, but a substantive rule that applies in equity as well as at law. *State ex rel. List v. Courtesy Motors,* 95 Nev. 103, 590 P.2d 163, 165 (1979).

 Although the rule prohibits admitting evidence that would change the terms of a clear, definite, and unambiguous written contract, "parol evidence is admissible to prove a separate oral agreement regarding any matter not included in the contract or to clarify ambiguous terms so long as the evidence does not contradict the terms of the written agreement." *Ringle,* 86 P.3d at 1037. For example, if a contract contained a blank space, parol evidence would be admissible to explain what information should have been entered therein, but would be inadmissible with respect to the remainder of the contract if the rest of the contract were unambiguous. *Pentax Corp. v. Boyd,* 111 Nev. 1296, 904 P.2d 1024, 1027 (1995). Additionally, where it "may be properly inferred that the parties did not intend the written pa-

per to be a complete and final settlement of the whole transaction between them, parol evidence is admissible." *Aladdin Hotel Corp. v. Gen. Drapery Servs., Inc.,* 96 Nev. 516, 611 P.2d 1084, 1086 (1980). A court must limit such evidence to matters on which the existing written agreement is silent, and the alleged oral agreement's terms must be consistent with the written agreement's terms. *Golden Press, Inc. v. Pac. Freeport Warehouse Co.,* 97 Nev. 163, 625 P.2d 578, 579 (1981).

 Additionally, parol evidence is admissible if the party attacking the instrument can establish fraud or mistake. *Chiquita Mining Co. v. Fairbanks, Morse & Co.,* 60 Nev. 142, 104 P.2d 191, 196 (1940). "[A] party relying upon fraud for this purpose must both plead and prove it." *Tallman,* 208 P.2d at 306–07. Nevada prohibits the introduction of parol evidence to contradict a writing on a simple allegation, without proof, of fraud or mistake. *Id.* at 307 ("It is only when independent facts constituting fraud are first proven that parol evidence is admissible."). Nevada requires proof of the fraud independent of the alleged oral agreement because:

> It is reasoning in a circle, to argue that fraud is made out, when it is shown by oral testimony that the obligee contemporaneously with the execution of a bond promised not to enforce it. Such a principle would nullify the rule: for conceding that such an agreement is proved, or any other contradicting the written instrument, the party seeking to enforce the written agreement according to its terms, would always be guilty of fraud.

*Id.* (quoting *Towner v. Lucas' Ex'r,* 54 Va. (13 Grat.) 705, 716 (Va.1857)). The alleged fraud must consist of fraud in procuring the instrument or a breach of confidence concerning its use, and not a promise con-

tradicting the written instrument's terms. *Id.*

The Retainer Agreement is valid, complete, and unambiguous. Although the Retainer Agreement does not contain an integration clause, the Retainer Agreement on its face is an integrated document. It sets forth the parties' agreement as to Nostro's retention of both attorneys as co-counsel, the amount of the contingency fee to be charged, the handling of costs, and the division of fees between the two attorneys. The contract covers the same terms as those Crockett and Fitzgerald discussed in the June 2001 telephone call. The notion that the attorneys entered into two separate agreements is untenable, as Crockett would have bargained away 100% of the fees if each of the agreements operated independently, 50% under the oral referral agreement and the other 50% under the written Retainer Agreement. Accordingly, under the parol evidence rule, the attorneys' prior negotiations merged into the written Retainer Agreement, and Fitzgerald cannot introduce evidence of prior oral agreements that vary or contradict the Retainer Agreement's terms.

The alleged oral terms Fitzgerald seeks to introduce contradict the written Retainer Agreement's terms. Fitzgerald contends Crockett agreed to pay Fitzgerald 50% of recovered fees for referring the Nostro case. This varies from and contradicts the written Retainer Agreement, which provides for an equal fee split where both attorneys are responsible for representing Nostro and where the attorneys agreed they would split equally all advanced costs. Accordingly, Fitzgerald's allegations regarding the alleged oral referral fee are barred by the parol evidence rule.

Fitzgerald argues the oral agreement and the Retainer Agreement involved different parties, and therefore the parol evidence rule does not apply. Fitzgerald relies on a case from the Texas Court of Appeals which states the "general rule" that "before one contract is merged into another, the last contract must be between the same parties as the first, must embrace the same subject matter, and must have been so intended by the parties." *Baroid Equip., Inc. v. Odeco Drilling, Inc.*, 184 S.W.3d 1 (Tex.App. 1 Dist.2005). This case is not controlling authority in Nevada. Fitzgerald has not cited any law indicating Nevada would require exact identity of parties between the prior oral agreements and the written agreement, and the Court found no such Nevada authority.

Further, *Baroid* was concerned with enforcing the parol evidence rule against a third party "stranger" to the written contract, not with enforcing the rule against parties to the written contract. *See id.* at 13–14. *Baroid* stated that where a "third party has been so involved with the creation of the written contract, or is claiming rights under the contract such that he is bound to abide by its terms, i.e., he is no longer a stranger to the contract," and thus the parol evidence rule can be invoked against the third party as well as parties to the written instrument. *Id. Baroid* thus does not stand for the proposition that the parties to the written contract must be completely identical to the parties to the alleged prior oral agreement for the parol evidence rule to apply.

Finally, Fitzgerald alludes to possible fraud by Crockett in allegedly inducing Nostro to fire Fitzgerald to avoid splitting fees with Fitzgerald. However, Fitzgerald has not pled fraud and therefore the parol evidence rule makes inadmissible any parol evidence that Crockett's insistence on enforcing the written contract's terms is fraudulent. The Second Amended Counterclaim does not allege Crockett advised Nostro to discharge Fitzgerald. Rather,

the Second Amended Counterclaim alleges Crockett advised Nostro she could discharge Fitzgerald. Additionally, the Second Amended Counterclaim does not allege Crockett did so with any fraudulent motive, such as to increase Crockett's share of the contingency fees.

For these reasons, the parol evidence rule bars Fitzgerald's first counterclaim for breach of the alleged oral referral fee agreement. The Court therefore will grant Crockett's motion to dismiss this claim.

## B. Breach of the Retainer Agreement

█ In count two of the Second Amended Counterclaim, Fitzgerald asserts Crockett breached the Retainer Agreement by holding a discussion about costs with Nostro without Fitzgerald's participation. Fitzgerald contends this breached the Retainer Agreement's provision that all matters of policy, including costs, "shall be determined jointly by the CLIENT and ATTORNEYS...." (Second Am. Countercl., Ex. A.) Crockett moves to dismiss this claim, asserting the contract unambiguously contains no requirement that Crockett include Fitzgerald in the phone conversation with Nostro regarding costs. Further, Crockett argues that if the Retainer Agreement does require the attorneys include each other in all cost conversations, Crockett's breach is excused by Fitzgerald's prior breach of this requirement because Fitzgerald breached previously discussed costs with Nostro in a conversation to which Crockett was not a party. Finally, Crockett argues Fitzgerald has unclean hands with respect to this claim. Fitzgerald responds the Retainer Agreement required joint determination of costs and because Crockett did not involve Fitzgerald in the general discussion of costs, he was not permitted to participation in the cost determination. Further, he argues it is a question of fact whether he first breached the Retainer Agreement because a conversation about whether to charge costs is a matter of policy to be jointly determined, but a conversation designed to collect certain costs does not involve policy.

█ "The interpretation of contract where the facts are not in dispute is a question of law." *Shelton v. Shelton*, 119 Nev. 492, 78 P.3d 507, 510 (2003). The goal of contract interpretation is to give effect to the parties' mutual intentions. *Pioneer Title Ins. & Trust Co. v. Cantrell*, 71 Nev. 243, 286 P.2d 261, 263 (1955) (quoting *Caruso v. John Hancock Mut. Life Ins. Co.*, 136 N.J.L. 597, 57 A.2d 359, 360 (1948) ("The law will not make a better contract for the parties than they themselves have seen fit to enter into....")). A document that is "clear on its face [ ] will be construed from the written language and enforced as written." *Sandy Valley Assocs. v. Sky Ranch Estate Owners Ass'n*, 117 Nev. 948, 35 P.3d 964, 967 (2001) (citing *Ellison v.C.S.A.A.*, 106 Nev. 601, 797 P.2d 975, 977 (1990)). A contract is ambiguous when it is "reasonably susceptible to different constructions or interpretations." *Agric. Aviation Eng'g Co. v. Bd. of Clark County Comm'rs*, 106 Nev. 396, 794 P.2d 710, 712 (1990).

█ A material breach by one party to a contract may excuse further performance by another party to the contract. *See Young Elec. Sign Co. v. Fohrman*, 86 Nev. 185, 466 P.2d 846, 847 (1970). "[T]he party who commits the first breach of a contract cannot maintain an action against the other for a subsequent failure to perform." *Bradley v. Nev.-Cal.-Or. Ry.*, 42 Nev. 411, 178 P. 906, 908–09 (1919).

The Second Amended Counterclaim asserts Crockett advised Nostro it was his firm's policy "not to go after a client for court costs and expenses." (Second Am. Countercl. at 6.) Further, Fitzgerald asserts Crockett did not involve Fitzgerald

in the cost discussion nor advise Nostro that under the Retainer Agreement they needed to do so. (*Id.* at 6–7.) Fitzgerald contends these failures led Crockett to advise Nostro his firm would not go after Nostro for costs despite the Retainer Agreement's provision that Nostro was responsible for costs. Further, Fitzgerald contends this was contrary to Fitzgerald's prior conversation with Nostro that he would require her to pay his share of the costs. Fitzgerald thus argues Crockett should have included Fitzgerald in the general discussion of costs, if not that particular phone call, so that the client and attorneys jointly could determine the cost situation as the Retainer Agreement provided. Instead, Crockett left Nostro with the impression that he would not charge costs, Fitzgerald would, and she could fire Fitzgerald if she desired.

Assuming this states a claim in the Second Amended Counterclaim, Crockett's alleged breach of the Retainer Agreement's provision that the attorneys and client jointly determine policy as to costs is excused by Fitzgerald's prior breach of the same provision. The Second Amended Complaint alleges that prior to Crockett's conversation with Nostro, Fitzgerald had "request[ed] that Mrs. Nostro pay her share of the costs." (Second Am. Countercl. at 6.) Fitzgerald did not include Crockett in his conversation with Nostro in which he requested she pay costs or otherwise involve Crockett in discussions regarding the attorneys' policy regarding whether they would seek payment of costs from the client before recovering the contingent fee. The Retainer Agreement provided that "All costs are to be deducted after the contingency fee has been calculated." (Compl., Ex. 1.) Fitzgerald's failure to include Crockett in making a joint determination regarding a recovery of costs policy excuses Crockett's subsequent alleged failure to involve Fitzgerald in his discussion of cost policy with Nostro. The

Court therefore will grant Crockett's motion to dismiss claim two.

## C. Tortious Interference With Contractual Relations

 In the Second Amended Complaint, Fitzgerald alleges Crockett's discussion with Nostro and his suggestion to her that she could fire Fitzgerald tortiously interfered with Fitzgerald's contractual relations with Nostro. Crockett moves to dismiss this claim, arguing a party to a contract cannot be liable for tortiously interfering with the contract, his alleged interference was privileged and justified, and tortious interference requires affirmative action as opposed to Crockett's inaction of not including Fitzgerald in the conversation with Nostro. Fitzgerald responds that Crockett individually was not a party to the Retainer Agreement, Crockett's interference was not privileged, justification is a factual issue not properly resolved on a motion to dismiss, and Crockett engaged in intentional acts designed to disrupt Fitzgerald's contractual relationship with Nostro.

 Under Nevada law, to establish intentional interference with contractual relations, a plaintiff must show: "(1) a valid and existing contract; (2) the defendant's knowledge of the contract; (3) intentional acts intended or designed to disrupt the contractual relationship; (4) actual disruption of the contract; and (5) resulting damage." *J.J. Indus., L.L.C. v. Bennett*, 119 Nev. 269, 71 P.3d 1264, 1267 (2003) (citing *Sutherland v. Gross*, 105 Nev. 192, 772 P.2d 1287, 1290 (1989)). "In Nevada, a party cannot, as a matter of law, tortiously interfere with its own contract." *Blanck v. Hager*, 360 F.Supp.2d 1137, 1154 (D.Nev.2005) (citing *Bartsas Realty, Inc. v. Nash*, 81 Nev. 325, 402 P.2d 650, 651 (1965)).

·Because a party to a contract cannot tortiously interfere with that contract, nei-

ther Crockett nor his firm, Crockett & Myers, can be liable for this tort as a matter of law. Contrary to Fitzgerald's assertion, both Crockett individually and his firm are parties to the Retainer Agreement. The Retainer Agreement states it is "by and between WENDY NOSTRO ... and J.R. CROCKETT and the law firm of CROCKETT & MYERS, and BRIAN FITZGERALD, ESQ ....." (Second Am. Countercl., Ex. A.) The Court therefore will grant Crockett's motion to dismiss this claim.

### D. Breach of the Implied Covenant of Good Faith and Fair Dealing, Joint Venture, and Breach of Fiduciary Duty

■ The Second Amended Counterclaim asserts claims for breach of the implied covenant of good faith and fair dealing (count four), joint venture (count five), and breach of fiduciary duty (count seven). Each of these claims rests on the assertions that Crockett discussed costs with Nostro and advised Nostro she could discharge Fitzgerald. Crockett moves to dismiss these claims, asserting his communications with Nostro were both privileged and justified. Crockett also argues Fitzgerald asserts these claims with unclean hands because he first communicated with Nostro about costs without Crockett's participation. Fitzgerald responds Crockett's motion raises issues of fact not suitable for determination on a motion to dismiss.

■ Nevada recognizes "the longstanding common law rule that communications uttered or published in the course of judicial proceedings are absolutely privileged." *Fink v. Oshins*, 118 Nev. 428, 49 P.3d 640, 643 (2002) (quoting *Circus Circus Hotels v. Witherspoon*, 99 Nev. 56, 657 P.2d 101, 104 (1983)). Generally, absolute privileges apply in situations where it is in the public interest that a person speak freely, even if from time to time some individuals may abuse the privilege. *Hampe v. Foote*, 118 Nev. 405, 47 P.3d 438, 440 (2002). "An absolute privilege is an immunity, which protects against even the threat that a court or jury will inquire into a communication." *Id.* The absolute privilege for communications related to judicial proceedings is based on the policy that as officers of the court, attorneys ought to have "the utmost freedom in their efforts to obtain justice for their clients." *Fink*, 49 P.3d at 643 (quotation omitted).

■ Whether the absolute privilege applies is a question for the court. *Id.* at 643–44. The absolute privilege's scope is "quite broad," and only need be "in some way pertinent to the subject of controversy." *Id.* at 644 (quotation omitted). Nevada has directed courts to apply the absolute privilege "liberally, resolving any doubt in favor of its relevancy or pertinency." *Id.* (quotation omitted).

Nevada has applied the absolute privilege related to judicial proceedings primarily in defamation actions, but has extended its application to other causes of action which derivatively depend upon the alleged defamation. *See Fink*, 49 P.3d at 643 (defamation); *Knox v. Dick*, 99 Nev. 514, 665 P.2d 267 (1983) (defamation and intentional infliction of emotional distress); *Sahara Gaming Corp. v. Culinary Workers Union Local 226*, 115 Nev. 212, 984 P.2d 164 (1999) (civil conspiracy, interference with contract, and interference with prospective economic damage which were derivative of defamation claim). However, Nevada has not addressed whether the privilege shields an attorney from civil liability for breach of the implied covenant of good faith and fair dealing or breach of fiduciary duty claims which are not derivative of a pled defamation claim.[1]

---

1. Fitzgerald also states a separate claim of "joint venture." (Second Am. Countercl. at

"When interpreting state law, federal courts are bound by decisions of the state's highest court." *Strother v. S. Cal. Permanente Med. Group*, 79 F.3d 859, 865 (9th Cir.1996) (quotation omitted). If the state has not addressed the particular issue, a federal court must use its best judgment to predict how the highest state court would resolve it "using intermediate appellate court decisions, decisions from other jurisdictions, statutes, treatises, and restatements as guidance." *Id.* (quotation omitted); *Med. Lab. Mgmt. Consultants v. Am. Broad. Cos., Inc.*, 306 F.3d 806, 812 (9th Cir.2002). In making that prediction, federal courts look to existing state law without predicting potential changes in that law. *Moore v. R.G. Indus., Inc.*, 789 F.2d 1326, 1327 (9th Cir.1986). Although federal courts should not predict changes in a state's law, they "are not precluded from affording relief simply because neither the state Supreme Court nor the state legislature has enunciated a clear rule governing a particular type of controversy." *Air–Sea Forwarders, Inc. v. Air Asia Co., Ltd.*, 880 F.2d 176, 186 (9th Cir.1989) (quotation omitted).

The Court concludes Nevada would extend the absolute privilege for communications related to judicial proceedings to the present factual scenario. The policies underlying the absolute privilege support extending it to this situation. It is in the public interest that attorneys speak freely with their clients, even if from time to time some attorneys may abuse the privilege to breach covenants of good faith and fair dealing or fiduciary duties to co-counsel under a fee-splitting agreement. An attorney's efforts to obtain justice for his client may include offering attorney-client advice that in other situations would constitute a breach of duties to a third party.

California has recognized an attorney cannot be held liable for urging a client to breach a contract with a third party. *Schick v. Lerner*, 193 Cal.App.3d 1321, 1329, 238 Cal.Rptr. 902 (2 Dist.1987). California reasoned as follows:

> public policy dictates that attorneys must remain free to counsel their clients without fear of subjecting themselves to liability as a result of the proper discharge of their professional obligations. Clients as well must feel free to seek out an attorney's advice on *any* issue at *any* time. Any rule to the contrary would constitute a serious impairment to the attorney-client relationship, and a resulting deleterious effect on the administration of justice.

*Id.* (emphasis in original; quotation omitted). Further, California has indicated that "[t]he policy of encouraging free access to the courts is so important that the litigation privilege extends beyond claims of defamation to claims of abuse of process, intentional infliction of emotional distress, negligent misrepresentation, invasion of privacy, fraud, and ... interference with contract and prospective economic advantage. In fact, the privilege applies to any action except one for malicious prosecution." *Pac. Gas & Elec. Co. v. Bear Stearns & Co.*, 50 Cal.3d 1118, 1132–33, 270 Cal.Rptr. 1, 791 P.2d 587 (1990).

Nevada affords the absolute privilege for communications associated with judicial proceedings broad scope and directs courts to apply that privilege liberally. The Court therefore concludes Nevada would find the policy considerations surrounding the attorney-client relationship and the communications related to ongoing judicial proceedings privilege would protect an attorney's communications to his client in

---

10–11.) The claim is based on Crockett's "duties of loyalty and as a fiduciary" arising out of the joint venture relationship. (*Id.*)

Thus, Fitzgerald's "joint venture" claim is a claim for breach of fiduciary duty.

the course of representing her in an ongoing proceeding in which he advised her that under the relevant retainer agreement she could fire co-counsel with whom she had become dissatisfied. The threat of potential liability to co-counsel should not interfere with an attorney's duties to discharge his professional obligations to his client. The absolute privilege grants attorneys the utmost freedom in their efforts to obtain justice for their clients, and that encompasses an attorney's advice to his client that she can fire co-counsel under the applicable retainer agreement. Such a result does not completely deprive the fired co-counsel of a remedy because he still may be entitled to recovery for the fair value of his services. *See Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 401 F.Supp.2d 1120, 1124–25 (D.Nev. 2005). The Court therefore will grant Crockett's motion to dismiss this claim.

### E. Unjust Enrichment

■ Count Six of the Second Amended Counterclaim asserts Crockett would be unjustly enriched if he kept the entire contingency fee. Crockett moves to dismiss this claim, asserting unjust enrichment is not an available claim where there is a written contract. Fitzgerald responds he may pursue this claim because the parties had an oral contract.

■ " 'The doctrine of unjust enrichment or recovery in quasi contract applies to situations where there is no legal contract but where the person sought to be charged is in possession of money or property which in good conscience and justice he should not retain but should deliver to another [or should pay for].' " *Leasepartners Corp. v. Robert L. Brooks Trust Dated Nov. 12, 1975*, 113 Nev. 747, 942 P.2d 182, 187 (1997) (quoting 66 Am.Jur.2d Restitution § 11 (1973)). An unjust enrichment claim is "not available when there is an express, written contract, because no

agreement can be implied when there is an express agreement." *Id.*

Because unjust enrichment does not apply where there is an express, written contract, Fitzgerald cannot state a claim for unjust enrichment in this case. Although Fitzgerald asserts he may bring the claim on the alleged oral agreement, the Court has ruled the oral agreement is integrated in the Retainer Agreement. The Court therefore will grant Crockett's motion to dismiss this claim.

### F. Constructive Trust

■ Count nine of the Second Amended Counterclaim requests a constructive trust over the contingent attorneys' fees earned in the Nostro case. Crockett moves to dismiss this claim, asserting a constructive trust is inappropriate where there is no identifiable res and Fitzgerald may recover money damages thus making the equitable remedy of constructive trust unnecessary. Fitzgerald responds that liquid proceeds may be the subject of a constructive trust and the contingency fees are an identifiable res.

■ In Nevada, a constructive trust is "a remedial device by which the holder of legal title to property is held to be a trustee of that property for the benefit of another who in good conscience is entitled to it." *Locken v. Locken*, 98 Nev. 369, 650 P.2d 803, 804–05 (1982). A constructive trust may be appropriate where: "(1) a confidential relationship exists between the parties; (2) retention of legal title by the holder thereof against another would be inequitable; and (3) the existence of such a trust is essential to the effectuation of justice." *Id.* at 805. Where a plaintiff can maintain an action at law and the legal remedy is adequate, sort to equity is not appropriate. *See Davenport v. State Farm Mut. Auto. Ins. Co.*, 81 Nev. 361, 404 P.2d 10, 13 (1965).

A constructive trust is not essential to the effectuation of justice in this case. Should Fitzgerald be entitled to a recovery for services rendered he may recover money damages. Because money damages will make Fitzgerald whole, resort to the equitable remedy of constructive trust is unnecessary.

## IV. CONCLUSION

IT IS THEREFORE ORDERED that Plaintiffs'/CounterDefendants' Motion to Dismiss Defendants'/CounterClaimants' Second Amended Counterclaim Pursuant to FRCP 12(b)(6) (Doc. # 46) is hereby GRANTED. Defendants'/CounterClaimants' counterclaims 1–7 and 9 are hereby DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiffs/Counterdefendants' Request for Permission to Exceed Page Limitation for Reply Brief (Doc. # 53) is hereby GRANTED.