*O'Brien & Gere Engineers, Inc. v. City of Salisbury*, No. 53, September Term, 2015, Opinion by Adkins, J.

**BREACH OF CONTRACT — LITIGATION PRIVILEGE — WAIVER OF PRIVILEGE IN SETTLEMENT AGREEMENT:** When a party brings a claim for breach of contract based on statements that allegedly violate a non-disparagement clause, the opposing party may avail itself of the litigation privilege for statements made by that party's counsel and witnesses in a judicial proceeding. In determining whether a party may have waived that privilege by entering a contract with a non-disparagement clause, we apply a rebuttable presumption against waiver in light of the important policies underlying the privilege. A review of the contract in this case, a settlement agreement, shows that the City of Salisbury did not waive the litigation privilege.

IN THE COURT OF APPEALS

OF MARYLAND

No. 53

September Term, 2015

O'BRIEN & GERE ENGINEERS, INC.

v.

CITY OF SALISBURY

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned)
Wilner, Alan M. (Retired,
    Specially Assigned),

JJ.

Opinion by Adkins, J.
Harrell, J. concurs and dissents.

Filed: April 26, 2016

The litigation privilege immunizes a party for statements made in a judicial proceeding and is fundamental to the courts' truth-finding mission. We have previously analyzed this privilege only in the defamation context. Today we address two distinct questions that arise out of a dispute between a city and a design engineer's settlement agreement to, among other things, not disparage one another. Can the litigation privilege immunize a party from a claim for breach of a non-disparagement clause? If so, can a party waive that privilege? We examine these questions to determine whether a trial court correctly granted a motion to dismiss a complaint for failure to state a claim for breach of contract.

## FACTS AND LEGAL PROCEEDINGS

The Maryland Department of the Environment required the City of Salisbury ("the City") to upgrade its wastewater sewage treatment plant ("WWTP"). The City then embarked on an $80 million large public works project by hiring O'Brien & Gere Engineers, Inc. ("OBG") as its design engineer and Construction Dynamics Group ("CDG") as its construction manager. The project failed because the WWTP did not work as expected and required.

Believing it did not get what it bargained for, the City sued OBG and CDG, among others, for various torts and breach of contract ("the WWTP Litigation").

With the advice of their respective attorneys, the City and OBG settled their dispute pursuant to an agreement ("the Settlement Agreement") in June 2012. In pertinent part, OBG agreed to pay the City $10 million in exchange for the City's promise to release OBG from all claims relating to the WWTP.

The City also made promises to OBG in the Settlement Agreement so that "OBG [would] not hav[e] to expend any further monies in connection with" the WWTP Litigation and would be protected "from any liability and expense associated with any [of the City's] claims" relating to the WWTP. First, the City agreed to defend, indemnify, and hold OBG harmless if any party (whether in the WWTP Litigation or in any future claim the City might bring) were to sue OBG "relating to the design or construction of or equipment supplied for [the WWTP]." Second, the City agreed to indemnify and hold OBG harmless if any such party obtained a judgment against OBG. Third, the City agreed that it would reduce any damages it recovered if OBG was "determined to be a joint tortfeasor" because of any final judgment. In exchange for these promises, OBG agreed to release the City from all of its WWTP claims.

OBG and the City also agreed not to disparage one another about the WWTP upgrade. The non-disparagement clause states:

> The City and OBG mutually agree that they will not make, or cause or encourage other persons or entities to make, any disparaging remarks or comments about each other relating to any matter having occurred prior to the effective date of this Settlement Agreement or in the future relating directly or indirectly to the Salisbury wastewater treatment plant through any means, including without limitation, oral, written or electronic communications, or induce or encourage others to publicly disparage the other settling party. For purposes of this paragraph, the term "disparaging" means any statement made or issued to the media, or other entities or persons that adversely reflects on the other settling party's personal or professional reputation and/or business interests and/or that portrays the other settling party in a negative light.

2

The parties agreed that, in the event of a breach of this provision, the non-breaching party "shall be" entitled to injunctive relief and reasonable attorney's fees. OBG believes that the City committed such a breach.

After the City released OBG from all claims relating to the WWTP Litigation, the City pursued a claim for breach of contract against CDG ("the CDG Lawsuit").[1]

On November 1, 2012, in his opening remarks to the jury, the City's trial counsel, Howard Goldberg, explained that "[the City] hired [CDG], and over the next three and a half years paid them $2,786,462.43. And the City just simply didn't get what they paid for." As to CDG's obligations to the City, Goldberg stated: "[CDG was] to advise [the City] of deficiencies which are discovered or suspected by the construction manager [CDG] which involve the design of the project." As to the deficiencies, Goldberg said: "[M]ost of the problems were design problems created by the design engineer, [OBG]. And they [CDG] should have been advising the City of those problems."[2]

---

[1] Both the City of Salisbury ("the City") and O'Brien & Gere Engineers, Inc. ("OBG") knew that the City would maintain a suit against CDG ("the CDG Lawsuit") after they executed their agreement ("the Settlement Agreement"). At the hearing on the City's motion to dismiss ("Amended Motion to Dismiss"), OBG's counsel acknowledged: "So, did we [OBG] know that the case was going to continue against CDG? Absolutely, we did."

[2] To bolster the argument that CDG failed to perform its contractual duties, Goldberg contended that CDG had a conflict of interest. That is, prior to contracting to serve as the City's construction manager, CDG had entered into an agreement with OBG to secure another job in the District of Columbia. In Goldberg's words, "they were in bed, partners with the very engineering firm they were supposed to watch."

CDG used its opening statements to establish that it was not responsible under its contract to the City for any of the design issues at the WWTP.[3] CDG averred that it caused no harm to the City "because the project was built on time, on budget, and there were no construction deficiencies."

Also on the first day of trial, the City used its first witness, Dr. Enos Stover ("Dr. Stover"), to explain to the jury the design problems that plagued the WWTP. On the second day of trial, the City used its second witness, John Jacobs ("Jacobs"), to establish CDG's obligations to the City, specifically, to report issues relating to OBG's design work. ("The construction manager is to overview any design issues, they're not to solve the design issue, but at least raise the issue to the City so that we can resolve it.").

When OBG caught wind of the City's statements in the CDG Lawsuit through a newspaper article, OBG sent a "cease and desist" letter to the City, but it was not assured, in its view, that the City would comply with the non-disparagement clause. OBG then filed a complaint against the City for injunctive and monetary relief. The City filed a motion to dismiss for failure to state a claim. The Circuit Court for Wicomico County denied OBG injunctive relief without issuing a ruling on the City's motion to dismiss. The City later filed an amended motion to dismiss ("the Amended Motion to Dismiss"), which the Circuit Court granted.

---

[3] CDG's counsel contended that its contract with the City required the City to "enter into a separate agreement with one or more engineers" to provide "design services for the project. And that's [OBG]. And it says, the [construction manager], that's CDG, shall not be responsible for architectural or engineering design."

4

Following OBG's timely notice of appeal,[4] the Court of Special Appeals affirmed. *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 222 Md. App. 492, 530 (2015). The intermediate appellate court reasoned that the proper inquiry was "whether immunity from liability is consistent with and will serve the public policy objectives of the [litigation] privilege." *Id.* at 522. Analyzing the facts in light of the public policy objectives, the intermediate appellate court concluded that "[t]he administration of justice would be served (and was served) by applying the absolute litigation privilege to immunize the City from liability for breaching the non-disparagement agreement by introducing evidence and making arguments to the trier of fact that included negative information about OBG's design of the plant upgrade." *Id.* at 526. In pertinent part, the court determined that "[e]vidence about flaws in OBG's design for the plant upgrade and any cause and effect between flaws in the design and the plant upgrade failure was indispensable to an informed factual resolution of the City's contract claim against CDG." *Id.* at 524–25. Judge Nazarian dissented.

Following OBG's appeal, we granted its Petition for Writ of Certiorari to address the following questions:

1. Whether the Court of Special Appeals erred in expanding the scope of the "litigation privilege" and finding that, as an absolute matter of law and without regard to the parties' intentions, no claim can stand for a deliberate and voluntary breach of a binding non-disparagement agreement when the disparaging statements are made in legal proceedings (even when the agreement contains no exception for statements

---

[4] This appeal was consolidated with OBG's timely notice of appeal of the denial of its complaint for injunctive relief. *O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 222 Md. App. 492, 505 (2015).

5

made in legal proceedings, and the breaching party is not compelled by subpoena or other compulsory process or circumstance to make the disparaging statements).

2. Whether the Court of Special Appeals erred in deciding the case on a preliminary Motion to Dismiss, without resolving or allowing any exploration and litigation of important factual questions (related to the parties' expectations and intentions) bearing on the scope and effect of the non-disparagement clause, including whether it waived the litigation privilege.

We think both questions presented are so intertwined as to warrant a unified discussion, and we conclude, as to the second question, that the Court of Special Appeals correctly affirmed the judgment of the Circuit Court. We explain, however, that whether the litigation privilege applies to a breach of contract claim turns in a particular case on whether applying the litigation privilege advances the policies favoring the privilege.

**STANDARD OF REVIEW**

In reviewing a motion to dismiss a complaint for failure to state a claim, we "must determine whether the trial court was legally correct, examining solely the sufficiency of the pleading." *Ricketts v. Ricketts*, 393 Md. 479, 492 (2006).[5] Our review of the pleading may extend to "its incorporated supporting exhibits, if any." *Id.* at 491 (citations and internal quotation marks omitted). As we stated in *Allied Investment Corp. v. Jasen*, when a trial or appellate court reviews a motion to dismiss for failure to state a claim, it is necessary to "assume the truth of all well-pleaded, relevant, and material facts in the

---

[5] The City's assertion notwithstanding, because the parties did not present factual allegations to the Circuit Court "beyond those contained in the complaint," we do not convert the City's Amended Motion to Dismiss into a motion for summary judgment. *Nickens v. Mount Vernon Realty Group, LLC*, 429 Md. 53, 62–63 (2012).

complaint and any reasonable inferences that can be drawn therefrom. 'Dismissal is proper only if the alleged facts and permissible inferences, so viewed, would, if proven, nonetheless fail to afford relief to the plaintiff.'" 354 Md. 547, 555 (1999) (citations omitted).

## DISCUSSION

OBG and the City dispute whether the City violated the non-disparagement clause in the Settlement Agreement because of the City's statements during the CDG Lawsuit. Conceding that the litigation privilege is absolute with respect to "defamation and other torts arising from statements made in legal proceedings," OBG argues that we should adopt a different approach with respect to its breach of contract claim. Because of the public policy favoring settlements, OBG contends, parties can waive the litigation privilege by contract. OBG views the proper question, then, as whether "the intentions and expectations of the parties or the particular factual context of the case" reveal a waiver of the litigation privilege. Remand is necessary, in OBG's view, because the Circuit Court granted the City's Amended Motion to Dismiss without a sufficient record to answer this question.

The City contends that OBG's focus is off because the nature of the claim—tort or contract—does not matter. In reading our defamation case law, the City deduces that "Maryland has always 'struck heavily in favor of the free disclosure of information during a judicial proceeding'" because of strong public policy reasons, which are just as relevant to OBG's breach of contract claim. (Quoting *Imperial v. Drapeau*, 351 Md. 38, 45 (1998)). Moreover, the City argues that the Circuit Court committed no error because the available facts supported the court's grant of the Amended Motion to Dismiss: (1) all allegedly

7

disparaging statements were made in a courtroom and (2) the Settlement Agreement did not forbid the City from discussing OBG's design of the WWTP in the CDG Lawsuit.

## MOOTNESS

Before we address these substantive arguments, we first consider the City's position that this case is moot. "This Court does not give advisory opinions; thus, we generally dismiss moot actions without a decision on the merits." *Dep't of Human Res., Child Care Admin. v. Roth*, 398 Md. 137, 143 (2007) (citation omitted). "'A case is moot when there is no longer an existing controversy between the parties at the time it is before the court so that the court cannot provide an effective remedy.'" *Clark v. O'Malley*, 434 Md. 171, 192 n.11 (2013) (citations omitted).

The Settlement Agreement states that, in the event of a breach of the non-disparagement clause, "the non-breaching party shall be entitled to equitable relief." The City argues that, even if it breached the non-disparagement clause, we cannot grant OBG the injunctive relief it sought because "the acts sought to be enjoined have ceased." (Quoting *State v. Ficker*, 266 Md. 500, 507 (1972)).

Without a doubt, injunctive relief is unavailable. OBG sought injunctive relief to prevent the City from making negative statements about OBG during the CDG Lawsuit. That lawsuit is over, with a verdict favorable to the City. As the City is no longer making negative statements about OBG that we could enjoin, injunctive relief is off the table. Yet, as OBG contends, "any mootness in regard to the claim for injunctive relief (arising from the termination of the WWTP Litigation) has no bearing" on OBG's claims for money damages and attorney's fees.

8

Not so fast, the City responds. In its view the Settlement Agreement precludes OBG from pursuing money damages. In pertinent part the Settlement Agreement states:

> The parties agree that, in the event of any breach of this non-disparagement provision, *damages/actual losses will be difficult or impossible to prove with requisite precision, and that an adequate remedy at law will not exist. Accordingly, in the event of a breach of this provision, the non-breaching party shall be entitled to equitable relief* . . . . Further, the non-breaching party shall be entitled to an award of reasonable attorney's fees and other litigation costs and expenses associated with enforcement of this provision against the breaching party.

(Emphasis added.) The City avers that "money damages may not be awarded" because the Settlement Agreement states that "an adequate remedy at law will not exist." OBG disagrees, construing the same language as "a necessary predicate to obtaining injunctive relief."

The Supreme Court of the United States "has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies." *Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982). Although such a basis is not now required in our state courts, it once was. *Compare* Maryland Rule 15-502(c) ("The court may not deny an injunction solely because the party seeking it has an adequate remedy in damages . . . ."), *and Seci, Inc. v. Chafitz, Inc.*, 63 Md. App. 719, 725 (1985) ("[A]lthough the law was once to the contrary, it is clear now that an injunction need not be denied merely because the party seeking it has an adequate remedy at law."), *with Musch v. Underwood*, 179 Md. 455, 459 (1941) ("The doctrine is well settled in this state that where a party has a certain, complete and adequate remedy at law, he cannot sue

9

in equity."), *and Anne Arundel Cnty. v. Whitehall Venture*, 39 Md. App. 197, 200 n.2 (1978) ("Traditionally, the non-existence of an adequate remedy at law was a prerequisite to injunctive relief.").[6]

In reviewing the above provision in the Settlement Agreement, we note that the language focuses precisely on the adequacy of a legal remedy, not on its availability. By no means does the Settlement Agreement state, as the City contends, that money damages shall not be awarded, or, shall not be available as a legal remedy.[7] *See Lasco Enters., Inc. v. Kohlbrand*, 819 So. 2d 821, 825 (Fla. Dist. Ct. App. 2002) (rejecting argument that money damages were unavailable because the contract language "did not place a limitation upon their available remedies, but instead, simply provided that the Kohlbrands 'may'

---

[6] Professor Dan B. Dobbs explains that "[a]n old tradition said that the injunction would not be issued if other remedies were 'adequate.'" Dan. B. Dobbs, Law of Remedies § 1.1, at 6 (2d ed. 1993). Although Professor Dobbs acknowledges that "[t]his rule has come upon heavy attack today and its existence has been called into doubt," *id.* § 2.5, at 86, he also notes that "[c]ourts do in fact sometimes deny injunctions when they believe damages to provide a sufficient remedy," *id.* § 1.1, at 6. *See also* Richard A. Lord, Williston on Contracts § 67:8, at 210 (4th ed. 2002) ("[B]efore specific performance may be decreed for breach of a contract for the purchase and sale of tangible personal property, the remedy at law, that is, damages, must first have been determined to be incomplete and inadequate to accomplish substantial justice."); *cf.* W. Page Keeton et al., Prosser & Keeton on Torts § 88A, at 631–32 (5th ed. 1984) ("There is an older tradition that once a nuisance is established and it is shown that damages do not furnish an adequate remedy, an injunction must issue.").

[7] *See Importers Serv. Corp. v. GP Chem. Equity, LLC*, 652 F. Supp. 2d 1292, 1302–03 (N.D. Ga. 2009) ("[T]he Agreement provides that after termination, Defendant may repurchase NovaRes from Plaintiff and that Defendant's repurchase of the product and Plaintiff's right to sell NovaRes 'shall constitute ISC's sole remedy for the termination or nonrenewal of this Agreement . . . .'"); *Poley v. Sony Music Entm't, Inc.*, 619 N.Y.S.2d 923, 926–27 (N.Y. Sup. Ct. 1994) (finding no claim of breach of contract available where the contract stated "Your only remedy for failure by CBS to release an Album will be termination in accordance with this paragraph.").

proceed in equity to enforce its rights or 'may' elect to receive the return of earnest money deposit. The provision does not state that the Kohlbrands 'shall' limit themselves to such remedies.").[8] Reviewing our case law, we discern that the parties must at least use clear language to show their agreement to limit available remedies. *See Mass. Indem. & Life Ins. Co.*, 269 Md. 364, 369–70 (1973) (rejecting the argument that the contract prohibited injunctive relief and explaining that "'[a] contract will not be construed as taking away a common-law remedy unless that result is imperatively required'") (citation omitted). We cannot agree with the City that this contract language shows the parties' intention to limit available relief. Rather, our research and the relevant language indicate an attempt by the parties merely to ensure the availability of injunctive relief. We conclude that the dispute over the meaning of the non-disparagement clause is not moot.

## NON-DISPARAGEMENT CLAUSE AS WAIVER OF LITIGATION PRIVILEGE

### *Preservation of OBG's Argument*

The City contends that OBG never argued to the Circuit Court its primary argument here—"that the City waived its right to rely on the absolute litigation privilege because it agreed to the non[-]disparagement provision contained in the Settlement Agreement." In the City's view, OBG's argument to the Circuit Court was "that the public policy favoring

---

[8] *Cf. Kaufman Bros. v. Home Value Stores, Inc.*, 279 P.3d 157, 159–62 (Mont. 2012) (reviewing a provision for contract enforcement "or" termination, and explaining that the petitioners "could do one or the other, but not both"); *Edge Grp. WAICCS LLC v. Sapir Grp. LLC*, 705 F. Supp. 2d 304, 322–23 (S.D.N.Y. 2010) ("[D]efendant's contention that plaintiff is barred by the amended Option Agreement from seeking specific performance plainly fails because the contract contains not a shred of language that might suggest, much less explicitly provide, that receipt of the one-million dollar deposit was plaintiff's only available remedy.").

enforcement of settlement agreements should prevail over the public policy underlying the absolute litigation privilege."

The City's non-preservation argument belies its own presentation of the issue to the Circuit Court at the hearing on the Amended Motion to Dismiss, in which it stated: "effectively the issue today is whether or to what extent or *what effect* the non-disparagement contract between the City of Salisbury and O'Brien & Gere has in relation to the absolute privilege in judicial proceedings that Maryland recognizes." (Emphasis added). When OBG argues in this appeal that the non-disparagement clause constitutes a waiver of the litigation privilege it raises the same issue—whether the City gave up its litigation privilege by signing the non-disparagement clause.

Moreover, at the same hearing, and in its Opposition to the Amended Motion to Dismiss, OBG relied on *Wentland v. Wass*, 25 Cal. Rptr. 3d 109 (Cal. Ct. App. 2005). In *Wentland*, the California intermediate appellate court concluded, in part, that the litigation privilege "should not apply in this breach of contract case" because "one who validly contracts not to speak . . . has [] waived the protection of the litigation privilege." *Id.* at 116.

Although OBG did not quote this exact language from *Wentland* before the Circuit Court, it made a similar point when it stated that the non-disparagement clause represented the City's "clear, unqualified, and unlimited" promise not to portray OBG in a negative light. The issue of whether the City waived its right to rely on the litigation privilege when it entered into the Settlement Agreement was argued in the Circuit Court, and is therefore preserved for our review. *See* Maryland Rule 8-131(a) ("Ordinarily, the appellate court

12

will not decide any other issue unless it plainly appears by the record to have been raised in or decided by the trial court . . . .").

### *Nature and History of Litigation Privilege*

We begin by examining the established contours of the litigation privilege, which accords the putative tortfeasor absolute immunity from civil liability. The litigation privilege dates back 500 years to the English Court of Queen's Bench. *See Beauchamps v. Croft*, 73 Eng. Rep. 639 (Q.B. 1497) ("[N]o punishment was ever appointed for a suit in law, however it be false and for vexation. And in the case above, it is indifferent to say that it is false or true[.]"). The privilege rests on the vital public policy of the "free and unfettered administration of justice." *Adams v. Peck*, 288 Md. 1, 5 (1980) (citation and internal quotation marks omitted). Expounding on the importance of this policy, we said in *Adams*:

> The ultimate purpose of the judicial process is to determine the truth. The investigation, evaluation, presentation and determination of facts are inherent and essential parts of this process. If this process is to function effectively, those who participate must be able to do so without being hampered by the fear of private suits for defamation.

*Id.*

"For witnesses, parties, and judges, we employ the 'English' rule, which provides that the putative tortfeasor enjoys absolute immunity from civil liability, even if the statement is wholly unrelated to the underlying proceeding." *Norman v. Borison*, 418 Md. 630, 650 (2011). *Norman* also instructs that "[f]or attorneys whose appearances are entered in a case, however, we follow the majority American rule and require that the defamatory

statement have some rational relation to the matter at bar before unfurling the umbrella of absolute privilege." *Id.* The litigation privilege has been described as "more of an immunity for litigators, by contrast to a qualified privilege." Paul T. Hayden, *Reconsidering the Litigator's Absolute Privilege to Defame*, 54 Ohio St. L.J. 985, 992 (1993).[9]

The litigation privilege is long-standing in Maryland, dating back to the 1880s. *See Maulsby v. Reifsnider*, 69 Md. 143 (1888) (involving statements made by an attorney in the course of a judicial proceeding); *Hunckel v. Voneiff*, 69 Md. 179 (1888) (involving statements made by witnesses). Although the disputes in *Maulsby* and *Hunckel* involved libel and slander, we have since observed that "[p]rivilege is not confined in the law of torts to matters of defamation." *Walker v. D'Alesandro*, 212 Md. 163, 169 (1957); *see Carr v. Watkins*, 227 Md. 578, 583 (1962) ("We find it clear that if there was immunity from liability for defamation, there was immunity from liability for the other alleged torts claimed by the declaration to have been committed."); Fowler V. Harper et al., Harper, James and Gray on Torts § 6.3, at 342–43 (3d ed. 2006) ("Although such situations are rarely litigated, it seems clear that persons participating in judicial, legislative, or executive proceedings enjoy the same privilege in disparagement cases as in defamation.").

The Restatement of the Law of Torts explains: "The privilege stated in this Section is based upon a public policy of securing to attorneys as officers of the court the utmost

---

[9] This article advocates for changes which would narrow the scope of the litigation privilege.

freedom in their efforts to secure justice for their clients. Therefore the privilege is absolute." Restatement (Second) of Torts § 586 cmt. a (1977).[10]

The meaning of "absolute" in this context should not be amplified beyond its intended use. "Absolute" simply relates to the speaker's motive. It does not mean that there are "no exceptions" to the privilege, as the City contends. *Norman* teaches that the absolute privilege is not available to attorneys for all statements they make in judicial proceedings. Rather, the statements must "have some rational relation to the matter at bar." *Norman*, 418 Md. at 650. When a privilege is absolute, "the court will not permit an inquiry into motive or purpose, since this could result in subjecting the honest person to harassing litigation and claims." W. Page Keeton et al., Prosser and Keeton on Torts 4.16, at 109 (5th ed. 1984). By contrast, when a privilege is qualified, "the defendant is justified so long as he was acting in good faith." *Id.*; *see also* Harper et al., James and Gray on Torts § 6.3, at 343 ("Because of the absolute—as distinguished from qualified—privilege, malice becomes irrelevant here.").

---

[10] The Restatement formulates the privilege as follows:

> An attorney at law is absolutely privileged to publish defamatory matter concerning another in communications preliminary to a proposed judicial proceeding, or in the institution of, or during the course and as a part of, a judicial proceeding in which he participates as counsel, if it has some relation to the proceeding.

Restatement (Second) of Torts § 586 (1977).

15

*Application of Litigation Privilege in Breach of Contract Action*

We are tasked with resolving the question, novel to Maryland, of whether the City can raise the litigation privilege as a defense to a claim not in tort, but for breach of contract. The City argues that "the doctrine of absolute privilege is not limited to defamation actions and should be equally applicable to a claim of breach of a non-disparagement clause in a contract."[11]

Many other jurisdictions have approved the use of the litigation privilege as a defense to claims sounding in breach of contract. *See Kimmel & Silverman, P.C. v. Porro*, 53 F. Supp. 3d 325, 343–44 (D. Mass. 2014) (applying Massachusetts law); *Johnson v. Johnson & Bell, Ltd.*, 7 N.E.3d 52, 56 (Ill. App. Ct. 2014); *Vivian v. Labrucherie*, 153 Cal. Rptr. 3d 707, 715 (Cal. Ct. App. 2013); *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377–78 (7th Cir. 2010) (applying Indiana law); *Rickenbach v. Wells Fargo Bank, N.A.*, 635 F. Supp. 2d 389, 401–02 (D.N.J. 2009) (applying New Jersey law); *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1195–97 (D. Nev. 2006) (applying Nevada law); *Arts4All, Ltd. v. Hancock*, 773 N.Y.S.2d 348, 351 (N.Y. App. Div. 2004); *Kelly v. Golden*, 352 F.3d 344, 350 (8th Cir. 2003) (applying Missouri law);[12] *cf. Ellis v.*

---

[11] OBG does not squarely address the City's position but instead jumps ahead to its waiver argument.

[12] OBG incorrectly states that the non-disparagement clause in *Kelly v. Golden* "contained explicit exceptions for 'privileged' statements." (Emphasis omitted.) Rather, the clause containing exceptions for privileged statements was the confidentiality clause, which required the parties "not [to] discuss, disclose, or release any information related to the [agreements referenced]." *Kelly v. Golden*, 352 F.3d 344, 348 (8th Cir. 2003).

*Kaye-Kibbey*, 581 F. Supp. 2d 861, 879–81 (W.D. Mich. 2008) (applying Michigan law);[13]

*but see Bardin v. Lockheed Aeronautical Sys. Co.*, 82 Cal. Rptr. 2d 726, 731 (Cal. Ct. App. 1999).[14]

These courts have explained that the privilege would be "valueless" or "meaningless" if the opposing party could bar application of the privilege just by drafting the claim with a non-tort label. *Kimmel & Silverman, P.C.*, 53 F. Supp. 3d at 343; *Johnson*, 7 N.E.3d at 56; *see Rickenbach*, 635 F. Supp. 2d at 401 ("If the policy, which in defamation actions affords an absolute privilege or immunity to statements made in judicial and quasi-

_____

[13] *Ellis v. Kaye-Kibbey*, 581 F. Supp. 2d 861, 880 (W.D. Mich. 2008), unlike this case, involved subpoenaed testimony. But *Ellis* suggested that it might have protected other communications as well:

> [T]his court holds that the Michigan Supreme Court would likely follow the same reasoning to preclude breach-of-contract liability [*sic*] one who gives testimony or produces information in a judicial proceeding—at least to the extent that such action was necessary to comply with a subpoena or other order (*and perhaps even if the communication was made in court in a judicial proceeding but not required by any subpoena or court order*).

*Id.* at 881 (emphasis added). In any event, the court in *Kimmel & Silverman, P.C. v. Porro* applied the litigation privilege even though the allegedly impermissible statements were made voluntarily. 53 F. Supp. 3d 325, 342 n.3 (D. Mass. 2014) ("This court recognizes that . . . the defendants were not compelled by the ethical rules to file the challenged documents . . . .").

[14] *Bardin v. Lockheed Aeronautical Sys. Co.*, 82 Cal. Rptr. 2d 726, 731 (Cal. Ct. App. 1999) prohibited the use of the litigation privilege in the face of a breach of contract claim. But *Bardin* is at odds with other California cases in which that state's appellate courts determine whether to apply the privilege by analyzing the policy implications on a case-by-case basis. *See, e.g., Vivian v. Labrucherie*, 153 Cal. Rptr. 3d 707, 715 (Cal. Ct. App. 2013) (and cases cited therein). The court in *Bardin* did not consider whether application of the privilege would further the underlying policies. 82 Cal. Rptr. 2d at 731.

judicial proceedings, is really to mean anything then we must not permit its circumvention by affording an almost equally unrestricted action under a different label.") (citations and internal quotation marks omitted). Indeed, to refuse to consider applying the privilege when the claim is not labeled as a tort is to ignore the possibility that the alleged harm derives from tortious conduct. *See Rain*, 626 F.3d at 378 ("[A]ppellants' breach of contract claim is largely indistinguishable from a tort claim alleging injury flowing from statements made in a judicial proceeding. While appellants technically seek liquidated damages under the settlement agreement, any damages they suffered were caused solely by the fact that the statements were (allegedly) tortious.").

We agree with the reasoning of these jurisdictions and conclude that the litigation privilege can apply as a defense to claims sounding in contract.

### *Litigation Privilege Applied to These Facts*

We now examine whether the City may rely on the litigation privilege to defend itself against OBG's claim of breach in this case. We have found only a handful of cases involving non-disparagement clauses and the privilege. These cases have generally focused on whether the application of the privilege would further the privilege's public policy reasons. *See, e.g.*, *Rain*, 626 F.3d at 377; *Wentland*, 25 Cal. Rptr. 3d at 114.[15]

---

[15] *See also Vivian*, 153 Cal. Rptr. 3d at 716 ("Application of the privilege under these circumstances promotes full and candid responses to a public agency, which is very much the purpose of the privilege and in the public interest. Denying application of the privilege would have exactly the opposite effect."); *Crockett & Myers, Ltd. v. Napier, Fitzgerald & Kirby, LLP*, 440 F. Supp. 2d 1184, 1195–97 (D. Nev. 2006) ("The absolute privilege grants attorneys the utmost freedom in their efforts to obtain justice for their clients, and that encompasses an attorney's advice to his client that she can fire co-counsel under the applicable retainer agreement.").

18

Drawing from these courts, we now inquire "whether applying the litigation privilege in this case would promote the due administration of justice and free expression by participants in judicial proceedings." *Rain*, 626 F.3d at 378. Two cases with contrary outcomes are instructive as we undertake this step in our discussion.

## *Rain v. Rolls-Royce Corp.*

In *Rain*, the U.S. Court of Appeals for the Seventh Circuit held that the litigation privilege protected a manufacturer from its competitors' claim for breach of a non-disparagement clause arising out of a settlement agreement. 626 F.3d at 375, 378.[16] The competitors averred that the manufacturer breached the non-disparagement clause by, among other things, "including certain allegations in [a] complaint" against third parties filed after the parties executed the settlement agreement. *Id.* at 376. The complaint alleged that the competitors had conspired with others "to obtain and use [its] proprietary information." *Id.* at 375. The Seventh Circuit reasoned that the manufacturer could defend itself against the breach of contract claim because

> application of the privilege here allows [the manufacturer] to pursue its claims against third parties without fear of future legal liability arising out of its efforts to protect its intellectual property rights. By contrast, the failure to apply the privilege would frustrate the underlying policy by discouraging [the manufacturer] from exercising its fundamental right to resort to the courts to protect its rights.

*Id.* at 378.

---

[16] Although tasked with applying Indiana state law, the U.S. Court of Appeals for the Seventh Circuit looked to the law in other jurisdictions because "[n]o Indiana court ha[d] addressed whether the absolute privilege precludes not only tort liability, but also contractual liability." *Rain v. Rolls-Royce Corp.*, 626 F.3d 372, 377 (7th Cir. 2010).

Here, the City pursued its already pending claim of breach of contract against CDG, a third party, as contemplated by the parties to the Settlement Agreement. In his opening statements, the City's trial counsel stated that "[CDG was] to advise the [City] of deficiencies which are discovered or suspected by [CDG] which involve the design of the project." In order to persuade the jury that CDG breached its contract with the City, the City *needed* to establish that OBG had defectively designed the WWTP, that CDG was obligated to advise the City of such issues, and that CDG failed to do so. This is precisely what the City did through its witnesses, Jacobs and Dr. Stover.[17] As in *Rain*, application of the litigation privilege allows the City to pursue its claims and protect its rights without fear of future legal liability.

OBG raises several unpersuasive arguments to distinguish *Rain*. First, it argues that, unlike this case, the non-disparagement clause in *Rain* had no definition of "disparage," saying simply that "none of the Parties will disparage the other." This distinction is meaningful to OBG because, with such a clear definition of the term, "there could be no finding in this case that the statements at issue did not constitute 'disparaging' comments within the meaning of the Settlement Agreement." We fail to see how this distinction has any bearing on our policy discussion or the policy discussion in *Rain*.

---

[17] Specifically, Jacobs testified that "[t]he construction manager [CDG] is to overview any design issues, they're not to solve the design issue, but at least raise the issue to the City so we can resolve it." And when asked to explain what components of the wastewater sewage treatment plant ("WWTP") did not work and why, Dr. Stover testified again and again that defective design caused the problems: (1) "Those [pump stations] did not work properly. Those were design issues."; (2) "The next component that did not work is the ultraviolet disinfection system. . . . I'd say that was a design problem."; and (3) "[Q:] Would you agree that this design was likely to fail? [A:] It did fail."

Second, OBG argues *Rain* is distinguishable because that court never considered the policy argument favoring enforcement of contracts. OBG is incorrect. Even though the *Rain* court stated that the policy argument was waived, the court went on to explain that the policy argument was unpersuasive because: "the agreement's enforceability is not at issue. Rather, the question is whether to impose liability for a violation of that agreement." *Rain*, 626 F.3d at 378.[18]

### *Wentland v. Wass*

In *Wentland*, a California intermediate appellate court held that the litigation privilege did not apply because the underlying policies would not be furthered by its application. 25 Cal. Rptr. 3d at 111, 116. Two partners brought an action for an accounting of three partnerships. *Id.* at 111. Through their attorney's statements and a declaration, these two partners explained that an audit of the books was just and reasonable because audits of other partnerships, including the Parkview Terrace partnership, had revealed self-dealing by the managing partner. *Id.* The managing partner filed a cross-complaint alleging that the other two partners had breached an agreement to "make no accusation or comment [which] alleged wrongdoing" by him concerning Parkview Terrace. *Id.* According to the cross-complaint, all three partners had entered into this agreement after the two partners began asserting—*not in court*—that the managing partner had misappropriated assets from Parkview Terrace. *Id.* at 112.

---

[18] We later address the question of whether the City violated the Settlement Agreement in our analysis of the non-disparagement clause.

21

Although the trial court in *Wentland* dismissed the cross-complaint on the basis of the litigation privilege, the intermediate appellate court reversed, explaining that the policies underlying the privilege were not advanced through its application. First, the privilege did not promote "access to the courts, truthful testimony or zealous advocacy" because "[t]his cause of action [was] not based on allegedly wrongful conduct during litigation . . . . it [was] based on breach of a separate promise independent of the litigation." *Id.* at 116. Second, the privilege did not promote finality because the two partner's comments about the managing partner "invite[d] further litigation as to their accuracy" when the agreement "presumably" ended the matter of the managing partner's conduct. *Id.*

To be sure, as in *Wentland*, OBG's claim relates to breach of a separate promise independent of litigation. But importantly, application of the privilege to the City's statements still promotes access to the courts, truthful testimony, and zealous advocacy. As we discussed earlier, those statements were essential to the City's case that CDG breached its contract with the City. We also recognize that the City's statements caused further litigation, as in *Wentland*. But, as we shall explain *infra*, we do not view the City's statements as inviting further litigation because they were made in the mutually anticipated court proceedings in which both parties clearly contemplated that OBG's work would be discussed.

OBG argues that *Wentland* is analogous because, in both cases, the application of the litigation privilege would frustrate the purpose of the agreements. We disagree. We begin by setting forth what OBG said, in relevant part, to the Circuit Court:

22

[W]hat their [the City's] position requires is actually reading into that settlement agreement language that doesn't exist there, to read into it an exception for statements made in court, would have completely frustrated the purpose of the clearly stated indemnification clause, hold harmless and defend clause, which was very broad in its terms and very clear in its terms, that if anybody in the wastewater treatment plant litigation took issue, whether by third-party complaint or some other kind of claim, took issue with our design, the City, these lawyers, were going to come into court and actually defend O'Brien & Gere.

OBG hones in on the provisions of the Settlement Agreement wherein the City promised to defend, indemnify, and hold OBG harmless "*from any claim asserted* (previously or at any time in the future) *by any other party* to the Lawsuit." (Emphasis added.) CDG, however, has not asserted any claim against OBG. As Judge Eyler, writing for the Court of Special Appeals, aptly noted, CDG has merely raised OBG's defective design as a defense.[19] But CDG's defense is "not a claim or suit against OBG." *O'Brien & Gere Eng'rs*, 222 Md. App. at 526 n.20. In other words, there is no inconsistency between the indemnification clause and the City's breach of contract claim. Thus, we are not persuaded

---

[19] During his opening statements, counsel for CDG said:

Again, this is the contract between CDG and the City. And it says, the City shall enter into a separate agreement with one or more engineers, hereinafter referred to as the engineer, to provide architectural and engineering design services for the project. And that's O'Brien & Gere. And it says, the CM, that's CDG, shall not be responsible for architectural or engineering design.

And during cross-examination of Dr. Stover, CDG's counsel asked, among other things: "[Q]: Would you agree that in the design of the plant O'Brien & Gere ignored commonly known and understood limitations on the equipment that it specified for the plant? [A]: I would agree with that."

that applying the litigation privilege would frustrate the purpose of the Settlement Agreement.

*Waiver of Privilege by Terms of Non-Disparagement Clause*

We now turn to OBG's argument that the City waived its litigation privilege by the terms of the Settlement Agreement. Tracking OBG's argument, we approach this issue in two steps. First, we examine whether the litigation privilege is waivable.

The City argues that the "Maryland public policy underlying the Absolute Litigation Privilege is logically inconsistent with OBG's waiver argument." The City reasons that "OBG's argument asks the Court to support a contractual interpretation that would **impede** Maryland Courts and juries from ascertaining vital and important facts during the trial of a case." (Emphasis in original.) For support, the City points to *United States v. Mezzanatto*, in which the United States Supreme Court acknowledged that "[t]here may be some evidentiary provisions that are so fundamental to the reliability of the factfinding process that they may never be waived without irreparably 'discredit[ing] the federal courts.'" 513 U.S. 196, 204 (1995) (emphasis omitted).

We recognize the fundamental importance of the fact-finding process. Indeed, that is in part why we have affirmed the litigation privilege for so many years. *See Imperial*, 351 Md. at 45 ("As a matter of public policy, the balance is struck heavily in favor of the free disclosure of information during a judicial proceeding."). It is also why we decide today that non-disparagement contracts should be construed with a rebuttable presumption *against* waiver of the litigation privilege. *Cf. Bollack v. Bollack*, 169 Md. 407, 409–11 (1936) (challenging party must provide evidence of undue influence to rebut the

24

presumption that the instrument was voluntarily executed); *Hovnanian Land Inv. Grp., LLC v. Annapolis Towne Ctr. at Parole, LLC*, 421 Md. 94, 123 (2011) ("The party alleging waiver must show an intent to waive both the contract provision at issue and the non-waiver clause.").

But we do not go quite as far as the City in declaring a ban against any and all waiver of that privilege (or the intermediate appellate court in elevating privilege over waiver as a matter of law). There may be situations in which there are good reasons to uphold a clear waiver of the litigation privileges—but that is a question for another day.

In previously affirming the litigation privilege in the tort context, we have acknowledged that our analysis "involves a matter of public policy in which the public interest in free disclosure must be weighed against the harm to individuals who may be defamed." *Adams*, 288 Md. at 5. In the context of breach of a settlement contract, the inquiry changes. We weigh not only the public policy of administration of justice against the individual harm defamation poses, but also consider the favorable policy of encouraging settlement agreements. *See Sisson v. Mayor & City Council of Balt.*, 51 Md. 83, 95–96 (1879) ("The law always favors compromises and amicable adjustments of disputes . . . ."). When we encourage parties to settle on their terms, the administration of justice is also served. Weighing the important policy concerns both parties raise, we conclude that, even if the litigation privilege can be waived by contract, in construing a non-disparagement clause, we will apply a rebuttable presumption against waiver of that privilege.

25

## Applying Rebuttable Presumption, Could This Be A Waiver?

OBG argues that the Circuit Court improperly granted the City's Amended Motion to Dismiss because the "intended effect of the non-disparagement agreement" upon the CDG Lawsuit was an "unresolved and critical dispute." Moreover, OBG avers, "whether the parties intended to waive the litigation privilege in the Agreement" could not "properly have been decided on a pre-answer motion to dismiss." OBG contends that it negotiated the non-disparagement clause to ensure that the City would not portray it in a negative light. It sought this assurance because, OBG argues, "it would no longer be a party to the City's continuing WWTP Litigation" and "no longer have the ability or be in a position to effectively defend itself against aspersions cast upon it by the City." OBG avers that the promise not to disparage "was clear, unqualified, and unlimited."

"We have defined waiver as 'the intentional relinquishment of a known right.'" *Smith v. State*, 394 Md. 184, 201 (2006) (attorney-client privilege) (citations omitted); *see Harrison v. State*, 276 Md. 122, 137 (1975) ("[T]he intent to waive [the attorney-client privilege] must, however, be expressed either by word or act, or omission to speak out.").

Keeping in mind our rebuttable presumption just discussed, we apply the rules of construction of contracts in interpreting a settlement agreement. *See Clark v. Ezra*, 286 Md. 208, 219 (1979) ("As long as the basic requirements to form a contract are present, there is no reason to treat such a settlement agreement differently than other contracts which are binding."). "The fundamental rule in the construction and interpretation of contracts is that the intention of the parties as expressed in the language of the contract controls the analysis." *Ford v. Antwerpen Motorcars, Ltd.*, 443 Md. 470, 477 (2015)

26

(citation and internal quotation marks omitted). To discern the parties' intentions, we look at "the contents of the document itself and not by consideration of the provisions separately." *Wheaton Triangle Lanes, Inc. v. Rinaldi*, 236 Md. 525, 530–31 (1964). We follow the "objective interpretation principle," that is, "[i]f the language of the contract is unambiguous, we give effect to its plain meaning and do not delve into what the parties may have subjectively intended." *Ford*, 443 Md. at 477 (citation and internal quotation marks omitted).

In light of our rebuttable presumption, the non-disparagement clause here does not prohibit the statements that OBG challenges. The term "disparaging" does not expressly reach the CDG Lawsuit. *See Harrison*, 276 Md. at 138 ("[T]he intent to waive [the privilege] must, however, be expressed either by word or act, or omission to speak out.").[20] The term, as defined in the Settlement Agreement, focuses instead on statements "made or issued to the media, or other entities or persons." Identifying this audience does not suggest that the City knew the Settlement Agreement would circumscribe the statements it could make in court. *Smith*, 394 Md. at 201 (citations omitted) ("Intrinsic to the definition of 'waiver' is the recognition that the client must be informed of both the scope and nature of the right being relinquished as well as the consequences of so doing.").

---

[20] *See also Vivian*, 153 Cal. Rptr. 3d at 715 (holding that the litigation privilege barred the breach of contract claim in part because "the agreement on which plaintiff relies *does not clearly prohibit* the conduct that plaintiff challenges") (emphasis added). The court in *Vivian* also applied the litigation privilege because, unlike here, some of the challenged conduct was "expressly removed from the scope of the agreement." *Id.*

Indeed, OBG's counsel acknowledged at the hearing on the Amended Motion to Dismiss that it knew the City's pending case was against CDG.[21] Furthermore, not only did OBG know about the pending litigation and its subject matter, but it promised to "produce Mr. Meinert and Ms. Knox for the completion of their depositions *in the pending case* at no expense to the City." (Emphasis added.)

Although OBG knew that the City had a pending suit against CDG, and although OBG expected that its role in the WWTP upgrade would come up during the CDG Lawsuit, the Settlement Agreement includes no language restricting the legal issues that the City could raise or the legal strategy that the City could take. Instead, OBG sought, above all else, to protect itself "from any *liability* and *expense* associated with any *claims*" relating to the WWTP. (Emphasis added.) OBG accomplished this purpose by: (1) requiring the City to defend, indemnify, and hold OBG harmless in the event anyone related to the WWTP Litigation were to sue OBG or were to obtain a judgment against OBG; and (2) requiring the City to reduce any damages it recovered if OBG were "determined to be a joint tortfeasor" as a result of any claims. OBG succeeded in accomplishing as much because, as it repeatedly asserts, "the City dismissed its professional negligence and other tort claims against CDG, and reduced its prayer for damages as to CDG from $60 million to $4 million" in order to "prevent a contribution claim by CDG against OBG, which would have triggered the City's indemnification obligations under the Settlement Agreement."

---

[21] "So, did we [OBG] know that the case was going to continue against CDG? Absolutely, we did."

But OBG nowhere precluded the City from discussing OBG's design work in the CDG Lawsuit.[22]

If we review the CDG Lawsuit transcripts (which OBG referred to in its complaint), then the only reasonable inference is that, as Judge Eyler wrote below, "the facts material to whether CDG breached its contract with the City were interrelated with the facts material to whether OBG's design was flawed." *O'Brien & Gere Eng'rs, Inc.*, 222 Md. App. at 524. This close interdependence causes us to conclude that the only reasonable interpretation of the Settlement Agreement is that the parties contemplated that OBG's design work would not only come into play during the CDG Lawsuit but also likely be bandied back and forth as the parties tried to hold each other responsible for overseeing OBG. Absent some express language in the Settlement Agreement that prohibited the City from making or encouraging others to make disparaging statements about OBG *in the CDG Lawsuit*, as a matter of law, and utilizing the presumption against waiver, we will not permit such inference.

## CONCLUSION

In sum, there is nothing in the Settlement Agreement addressing whether the City could discuss OBG's design work or portray OBG in a negative light in the CDG Lawsuit,

---

[22] We recall OBG's argument that it wanted the non-disparagement clause because it would "no longer have the ability or be in a position to effectively defend itself against aspersions cast upon it by the City." The problem, as we see it, is OBG's use of the word "defend." As our discussion illustrates, the Settlement Agreement ensured OBG no longer had to defend itself against claims relating to the WWTP. For OBG to assert that it could no longer defend itself against *aspersions* the City might cast upon it *in court* is a different matter entirely, and one that, as we have explained, involves broad and fundamental policy considerations underlying the litigation privilege.

litigation the parties clearly anticipated.  Applying a rebuttable presumption against waiver

of the litigation privilege, we conclude that the City did not waive the litigation privilege

in the non-disparagement clause, and the Circuit Court correctly granted the City's

Amended Motion to Dismiss.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS AFFIRMED.  COSTS TO BE PAID BY PETITIONER.**

Circuit Court for Wicomico County
Case No.: 22-C-12-001782
Argued: January 11, 2016

IN THE COURT OF APPEALS

OF MARYLAND

No. 53

September Term, 2015

O'BRIEN & GERE ENGINEERS, INC.

v.

CITY OF SALISBURY

Barbera, C.J.
Greene
Adkins
McDonald
Watts
Harrell, Glenn T., Jr. (Retired,
    Specially Assigned)
Wilner, Alan M. (Retired,
    Specially Assigned),

JJ.

Concurring and Dissenting
Opinion by Harrell, J.

Filed: April 26, 2016

Although I agree with the Majority opinion's determinations that: (1) the case is not moot (Maj. Slip op. at 8-11); (2) the City's non-preservation argument is without merit (Maj. Slip op. at 11-13); (3) the litigation privilege is not absolute (Maj. Slip op. at 15-16; (4) the litigation privilege may apply to causes of action sounding in contract (Maj. Slip op. at 16-18); and, (5) the litigation privilege may be waived, which analysis is undertaken with a rebuttable presumption of non-waiver as a threshold (Maj. Slip op. at 24-26), I dissent from the judgment that the Court of Appeals's affirmance of the trial court's grant of the City's motion to dismiss was correct as a matter of law.

I agree with the reasoning of Judge Nazarian's dissent in the Court of Special Appeals wherein he concluded ultimately that

> [t]he outcome of [this case] depends in the first instance on what the parties intended the non-disparagement clause to cover. The circuit court erred in dismissing the case in the face of that looming factual dispute, and I would reverse and remand on that basis. From there, I would hold that the City could well have agreed to limit its litigation positions in the ongoing litigation, whether viewed as a positional or tactical decision or as a waiver of the litigation privilege, and direct the circuit court on remand to address OBG's claims against that backdrop.

*O'Brien & Gere Eng'rs, Inc. v. City of Salisbury*, 222 Md. App. 492, 541, 113 A.3d 1129, 1158 (2015).