**PUBLISHED**

UNITED STATES COURT OF APPEALS
FOR THE FOURTH CIRCUIT

─────────────

**No. 17-2120**

─────────────

MICHAEL S. DAY, JR., As Personal Representative and Administrator of the Estate of Michael S. Day, Sr. and on behalf of all others similarly situated; CHRISTI ANN JORDAN JARRETT, As Personal Representative and Administrator of the Estate of Junior McCoy Barr and on behalf of all others similarly situated,

　　　　　Plaintiffs – Appellants,

　　v.

JOHNS HOPKINS HEALTH SYSTEM CORPORATION, d/b/a The Johns Hopkins Hospital; THE JOHNS HOPKINS HOSPITAL, INC., d/b/a The Johns Hopkins Hospital; JOHNS HOPKINS IMAGING, LLC; THE JOHNS HOPKINS UNIVERSITY, d/b/a Johns Hopkins Hospital; PAUL WHEELER, MD,

　　　　　Defendants – Appellees.

------------------------------------------------------------

NATIONAL BLACK LUNG ASSOCIATION,

　　　　　Amicus Supporting Appellant.

─────────────

Appeal from the United States District Court for the District of Maryland, at Baltimore. J. Frederick Motz, Senior District Judge.  (1:16-cv-03944-JFM)

─────────────

Argued:  September 26, 2018　　　　　　　　　Decided:  October 26, 2018

─────────────

Before WILKINSON, KING, and THACKER, Circuit Judges.

─────────────

Affirmed by published opinion. Judge Wilkinson wrote the opinion, in which Judge Thacker joined. Judge King wrote a dissenting opinion.

———————————

**ARGUED:** Jonathan B. Nace, NIDEL & NACE, PLLC, Washington, D.C., for Appellants. James David Mathias, DLA PIPER LLP (US), Baltimore, Maryland, for Appellees. **ON BRIEF:** Christopher T. Nidel, NIDEL & NACE, PLLC, Washington, D.C., for Appellants. Andrew Jay Graham, Amy E. Askew, Justin A. Redd, KRAMON & GRAHAM PA, Baltimore, Maryland, for Appellee Paul Wheeler, M.D. Robert J. Mathias, Benjamin D. Schuman, DLA PIPER LLP (US), Baltimore, Maryland, for Appellees The John Hopkins Health System Corporation, The Johns Hopkins Hospital, Inc., Johns Hopkins Imaging, LLC, and The Johns Hopkins University. Stephen A. Sanders, APPALACHIAN CITIZENS' LAW CENTER, Whitesburg, Kentucky, for Amicus Curiae.

———————————

WILKINSON, Circuit Judge:

Plaintiffs brought suit against Dr. Paul Wheeler and Johns Hopkins Health System et al. for Wheeler's actions as an expert witness in administrative hearings for the Federal Black Lung Program. This lawsuit included a federal claim under the Racketeer Influenced and Corrupt Organizations Act (RICO), Pub. L. No. 91-452, Title IX (1970) (codified at 18 U.S.C. §§ 1961-1968 (2012)), as well as a variety of state law claims. The district court dismissed each of these claims on the basis of the Witness Litigation Privilege, which protects witnesses who testify in judicial and quasi-judicial proceedings from later civil liability. For the reasons that follow, we affirm.

I.

Congress enacted the Black Lung Benefits Act (BLBA) to compensate coal miners afflicted with pneumoconiosis, commonly known as black lung disease. Pub. L. No. 91-173 (1969) (codified at 30 U.S.C. § 901 et seq. (2012)). A coal miner must demonstrate "total disability or death due to pneumoconiosis" in order to obtain benefits. 20 C.F.R. pt. 718. *See Westmoreland Coal Co., Inc. v. Cochran*, 718 F.3d 319, 320 (4th Cir. 2013). This disability must arise "at least in part out of coal mine employment." 20 C.F.R. § 718.203. If a miner is deemed eligible for benefits, "the mine operator that employed the disabled miner is liable for payment of those benefits." *RB&F Coal, Inc. v. Mullins*, 842 F.3d 279, 281 (4th Cir. 2016). When a miner has worked for multiple coal companies, "the Secretary of Labor [may] promulgate regulations to establish standards for apportioning liability among operators." *Id.* To determine eligibility, the Act

3

combines features of expert administrative governance with the adversarial means of truth-seeking that are familiar to courts of law. *See Sea "B" Mining Co. v. Addison*, 831 F.3d 244, 248 (4th Cir. 2016) ("The Act creates an adversarial administrative procedure.")

The procedural path of the program is as follows. First, a district director from the Department of Labor completes a preliminary analysis of a miner's claim. 20 C.F.R. § 725.401. If the miner is not satisfied with this determination, he or she is next able to challenge the director's decision before an Administrative Law Judge (ALJ). The coal company that will ultimately be liable if the miner is successful is invited to contest the claim before the ALJ. *Id.* § 725.407. These proceedings between the miner and the company borrow heavily from judicial process. The miner and coal company are situated as adversaries. Each party can present evidence, offer witnesses, cross-examine adverse experts, and brief its case. *Id.* §§ 725.414; 725.455(d); 725.457(a). For its part, the ALJ possesses such judicial powers as the authority to administer oaths, issue subpoenas, and direct discovery proceedings, among other things. *Id.* §§ 725.351; 725.455(b). After the hearing, the ALJ must set forth a decision and order containing "a statement of the basis for the order, findings of fact, [and] conclusions of law." *Id.* § 725.477. The decision of the ALJ can be appealed to the agency's Benefits Review Board, *id.* § 725.481; while decisions of the Board can in turn be appealed to the appropriate United States Court of Appeals. *Id.* § 725.482.

Appellants are the survivors of two coal miners who sought benefits under the BLBA, Michael Day and Junior Barr. All of the claims in this case stem from actions

4

taken by Dr. Wheeler and his colleagues as part of the agency's adversary process. Day's proceedings began in 2004, while Barr filed for benefits four times between 1981 and 2010. Dr. Wheeler, along with his radiology unit at Johns Hopkins University, provided expert opinions to coal mine operators that opposed the miners' claims. He offered his opinion in both Day and Barr's hearings, concluding that neither suffered from black lung disease.

This appeal comes to us on a motion to dismiss for failure to state a claim. Fed. R. Civ. P. 12(b)(6). We therefore "accept as true all well-pled facts in the complaint." *SD3, LLC v. Black & Decker (U.S.) Inc.*, 801 F.3d 412, 422 (4th Cir. 2015). According to the appellants, Wheeler's expert opinion was biased toward industry. Specifically, they allege that Dr. Wheeler concluded that the X-ray results in each case were not consistent with black lung disease and could instead be explained by other conditions, even when proper application of medical standards would lead to a contrary opinion. Appellants further allege that he misled the tribunal and the miners as to which standards he was applying. Appellants acknowledge that they were afforded an opportunity to present contrary evidence and did in fact submit competing medical opinions.

Appellants contend, however, that Dr. Wheeler's systemic violation of international standards was not apparent until the Center for Public Integrity (CPI) published a critical report on the Johns Hopkins radiology unit in 2013. According to the CPI report, which is the foundation for the complaint in this case, Dr. Wheeler and his colleagues at Johns Hopkins were much less likely to find cases of black lung disease than other doctors. This made the unit a favorite of coal companies, which routinely used

5

these opinions to defeat miners' claims. As asserted by CPI, Wheeler reviewed more than 1,500 cases and never once concluded that a claimant suffered from a severe case of black lung. *See* Chris Hamby et al., Ctr. for Pub. Integrity, Breathless and Burdened: Part 2 (Oct. 30, 2013).

The Department of Labor acted following the CPI report's publication. In 2014, the agency instructed its staff not to credit any evidence based on Dr. Wheeler's expert opinion in the absence of persuasive evidence challenging CPI's conclusions. DOL also encouraged coal miners who had been adversely affected by his testimony to refile for benefits. *See* U.S. Dep't of Labor, Office of Workers' Compensation Programs, BLBA Bulletin, No. 14-09 (June 2, 2014). Both Day and Barr were awarded posthumous benefits after the report was published. The survivors of both men allege that these benefits are less than would have been awarded if their claims had not been denied on the basis of Dr. Wheeler's testimony. This civil suit followed.

In their complaint, plaintiffs raised a federal RICO claim and state law claims for fraud, tortious interference with economic interests, negligent misrepresentation, and unjust enrichment. The district court dismissed each of their claims on the same ground—the Witness Litigation Privilege. In the view of the district judge, the privilege shielded the defendants from civil liability for their actions as expert witnesses during BLBA proceedings.

## II.

Our law affords absolute immunity to those persons who aid the truth-seeking mission of the judicial system. This protection extends to judges, prosecutors and witnesses. *See Pierson v. Ray*, 386 U.S. 547, 554 (1967); *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976); *Briscoe v. Lahue*, 460 U.S. 325, 330-34 (1983). Immunity for witnesses—commonly known as the Witness Litigation Privilege—is a longstanding and necessary part of the common law's approach to adversarial adjudication. In fact, "the immunity of parties and witnesses from subsequent damages liability for their testimony in judicial proceedings was well established in English common law." *See Briscoe*, 460 U.S. at 330-31. When a witness takes the oath, submitting his own testimony to cross-examination, the common law does not allow his participation to be deterred or undermined by subsequent collateral actions for damages. The vital protection afforded all participants in litigation is unwavering. It is a bedrock of our law today just as it was centuries ago. *See Rehberg v. Paulk*, 556 U.S. 356, 363 (2012); *Bradley v. Fisher*, 80 U.S. 335, 346-47 (1871).

The Witness Litigation Privilege is a broad one. It applies to those who come forward of their own volition as well as those who are compelled, *see Briscoe*, 460 U.S. at 333; to those who provide factual testimony as well as those who provide opinions, *see Bruce v. Byrne-Stevens & Assoc. Eng'rs*, 776 P.2d 666, 668-69 (Wash. 1989) (en banc) (applying privilege to expert witnesses); to those who appear before administrative tribunals as well as those who appear in court, *compare Butz v. Economou*, 438 U.S. 478, 512 (1978) (agency adjudication), *with Bradley*, 80 U.S. at 347 (judicial branch

7

proceeding); and to those who act with malice or ill will as well as those who are simply mistaken in their recollections. As the Supreme Court put it, "[t]he witness had an absolute privilege [and] [t]he plaintiff could not recover even if the witness knew the statements were false and made them with malice." *Briscoe* 460 U.S. at 330; *see also Norman v. Borison*, 17 A.3d 697, 709 ( Md. 2011). This immunity extends not only to the testimony a witness actually provides, but also to the witness's actions in preparing that testimony. *See Rehberg*, 566 U.S. at 370. The Witness Litigation Privilege in other words is foundational to any system of adversary justice, and is therefore vital to both federal law and the law of the sovereign states.

As with any other privilege or immunity, there will of course be questions about its scope. Litigants may fight about who counts as a witness or whether proceedings are sufficiently judicial in character. *See, e.g.*, *Franklin v. Terr*, 201 F.3d 1098, 1102 (9th Cir. 2000) (finding that witnesses who conspire to present perjured testimony are shielded by immunity); *Gersh v. Ambrose*, 434 A.2d 547, 551 (Md. 1981) (finding that appearance before a city human relations commission was not analogous to judicial proceedings). Once the witnesses' actions fall within the scope of the immunity, however, its protection is absolute.

No privilege comes without a cost. A privilege is a trade-off. It protects some admittedly bad actors in the hopes of achieving a much larger good. The reason for the witness privilege here is plain: the prospect of liability for those who participate in judicial proceedings would weaken "the ultimate fairness of the operation of the system itself." *Imbler v. Pachtman*, 424 U.S. 409, 427 (1976) (discussing the absolute immunity

for prosecutors). The benefits of the immunity flow to all participants in litigation. During trial, the judge's "focus should not be blurred by even the subconscious knowledge that a post-trial decision in favor of" one party may lead to a damages action by the other. *Id.* Likewise, a witness asked to testify without absolute protection may decline to do so, fearful of retribution. Even if a witness does accept or is compelled to appear, he still may "be inclined to shade his testimony in favor of the potential [collateral action] plaintiff, to magnify uncertainties, and thus deprive the finder of fact of candid, objective, and undistorted evidence." *Briscoe*, 460 U.S. at 333. This privilege does not serve any particular party; witnesses put forward by the plaintiff and the defendant are protected with equal force. Both may be frustrated by the privilege's applicability to a witness that they feel thwarted their case. However, "the claims of an individual must yield to the dictates of public policy, which requires that the paths which lead to the ascertainment of truth should be left as free and unobstructed as possible." *Id.* at 323-33 (quoting *Calkins v. Sumner*, 13 Wis. 193, 197 (1860)).

The absolute protection of the privilege does not empower a witness to violate his oath with impunity, however. First, witness statements are routinely submitted to the "crucible of cross-examination," which has always served as the vehicle for discovering the truth in our judicial system. *See Crawford v. Washington*, 541 U.S. 36, 61 (2004). Second, recognizing immunity from collateral civil attacks "does not leave the public powerless to deter misconduct or to punish that which occurs." *Imbler*, 424 U.S. at 428-29. Tribunals can disqualify unscrupulous witnesses from appearing in future proceedings. Prosecutors are authorized to, in a severe case, seek a conviction for perjury

against a witness who has knowingly lied under oath. 18 U.S.C. § 1621; *see Imbler*, 424 U.S. at 429 ("This Court has never suggested that the policy considerations which compel civil immunity for certain government officials also place them beyond the reach of the criminal law."). As the Supreme Court recognizes, the criminal sanction for perjury is vital to "the integrity of our trial system" and ensures that "all testimony . . . has greater value because of the witness' oath and the obligations or penalties attendant to it." *United States v. Dunnigan*, 507 U.S. 87, 97 (1993). In a public benefits setting like this one, moreover, the legislature or agency may also provide avenues of redress to those who believe they have been wronged by false testimony. The Department of Labor afforded such an opportunity here, inviting those adversely affected by Wheeler's testimony to request reconsideration of their denial of benefits.

All of these remedial measures share one critical feature: they place the decision to sanction the witness under the authority of a neutral officer—whether it be a judge, agency official, or prosecutor—rather than in the hands of a disgruntled adversary. Unlike a later collateral attack on witness testimony, however, the above measures deter and punish misleading statements without extending the conflict of one trial into future confrontations between a winning and losing party.

It requires no great feat of imagination to see where a civil action for damages against a witness would lead. Armed with a cause of action against opposing witnesses, both parties would use such actions to strafe those who testified for the other side. For "controversies sufficiently intense to erupt in litigation are not easily capped by a judicial decree. The loser in one forum will frequently seek another." *Butz*, 438 U.S. at 512. The

10

havoc would fall on experts and lay witnesses alike, just as it would fall on those who appeared for the plaintiff, the defendant, or the prosecution. Stripped of their immunity, witnesses would be dragged into court once again, this time asked to defend their earlier testimony.

Any erosion of the common law immunity for witnesses would undermine the truth-seeking function of the initial proceeding, invite new claims by disgruntled litigants, and deter participation by those in a position to offer valuable testimony. The privilege has been around so long and recognized so widely for a reason: it helps the judicial system work.

III.

With these principles of the common law in mind, we now turn to the question of whether the privilege applies here. The appellants have raised both federal and state law claims. Despite some unnecessary invocations of the Supremacy Clause, preemption is not the dispositive issue in this case. The Witness Litigation Privilege is part of both federal common law and the state law of Maryland. The absolute immunity found in both bodies of law are coextensive. *Compare O'Brien & Gere Eng'rs v. City of Salisbury*, 135 A.3d 473, 482 (Md. 2016) ("The litigation privilege dates back 500 years to the English Court of Queen's Bench. The privilege rests on the vital public policy of the free and unfettered administration of justice." (quotations omitted)), *and Norman v. Borison*, 17 A.3d 697, 708 (Md. 2011) ("For witnesses . . . we employ the 'English' Rule, which provides that the putative tortfeasor enjoys absolute immunity from civil liability."), *with*

11

*Briscoe*, 460 U.S. at 331 ("[W]itnesses ha[ve] an absolute privilege . . . from subsequent damages liability for their testimony in judicial proceedings.").

To resolve this case, therefore, requires answering two questions. First, we must decide whether Dr. Wheeler's actions, as alleged in the complaint, fall within the scope of the historic immunity. If they do, we must next determine whether the appellants' cause of action in some way displaces the common law privilege. We shall take these questions up in turn.

A.

The allegations made against Dr. Wheeler and his associates at Johns Hopkins fall squarely within the scope of the Witness Litigation Privilege. As an initial matter, the appellants do not question that the administrative proceedings here are quasi-judicial in nature. The Supreme Court has recognized that the need for witness immunity does not turn on a tribunal's "particular location within government." *Butz v. Economou*, 438 U.S. 478, 512 (1978). Instead, "the cluster of immunities protecting the various participants in judge-supervised trials stems from the characteristics of the judicial process." *Id.* This functional approach recognizes that the public policy concerns that motivate immunity in court apply just as forcefully when the witness appears in other adjudicative proceedings that share the essential features of litigation. State courts, including those in Maryland, agree. *See Reichardt v. Flynn*, 823 A.2d 566, 571-72 (Md. 2003); *Odyniec v. Schneider*, 588 A.2d 786, 792-93 (Md. 1991). The proceedings administered by the Department of Labor under the BLBA clearly bear the essential hallmarks of the judicial function. The

12

scheme positions coal miners and coal companies as adverse parties, allowing for briefing, clashing evidence, and cross-examination. The hearings are overseen by neutral arbiters, who are tasked with finding the facts and ensuring procedural fairness. A functional test would have little relevance if it were not satisfied here.

The allegations against Dr. Wheeler relate to testimony and opinions that he offered in the appellants' BLBA proceedings. Appellants offer several bases for finding that Dr. Wheeler's testimony in these proceedings was nonetheless outside the privilege. First, appellants suggest that Maryland law limits the absolute privilege to claims for defamation, while adopting a balancing test for other claims. This misreads the Maryland courts. The privilege for witnesses undoubtedly emerged from early defamation actions brought against witnesses for statements made during trial. This does not mean, however, that the privilege has less force in other contexts. The Maryland courts apply the privilege to any "words spoken or written in the course of or in connection to a judicial proceeding." *O'Brien v. Gere Eng'rs v. City of Salisbury*, 113 A.3d 1129, 1140 (Md. Ct. Spec. App. 2015), *aff'd*, 135 A.3d 473 (Md. 2016). As such, "the precise theory of recovery is not dispositive" of whether the immunity applies. *Id*. Maryland's highest court has agreed that "the privilege would be 'valueless' or 'meaningless' if the opposing party could bar application of the privilege just by drafting the claim with a non-tort label." *O'Brien*, 135 A.3d at 485. That sort of gamesmanship cannot be allowed. The purposes of the privilege—encouraging uninhibited and unchilled witness participation— do not suddenly disappear when the collateral attack on witness testimony does not take the precise form of a defamation action.

13

Appellants insist, however, that expert witnesses who appear voluntarily are less entitled to protection than eye witnesses or government agents. They also assert that witnesses who engage in deliberate fraud are less worthy of immunity than those who simply misstate the facts. No relevant citations are offered for these arguments because none are likely to exist. The dearth of authority is yet another indication that once the privilege attaches, it bars all civil claims stemming from the witness's participation before the tribunal. The fact that Dr. Wheeler appeared as an expert witness has no effect whatsoever on the question of witness immunity. *See, e.g.*, *Wilson v. Bernet*, 625 S.E.2d 706, 713 (W. Va. 2013) ("[W]e therefore hold that an adverse expert witness enjoys civil immunity for his/her testimony and/or participation in judicial proceedings where such testimony and/or participation are relevant to said judicial proceedings."). Moreover, while the alleged conduct in this case, if true, would be morally reprehensible, that is simply not dispositive of the legal question before us. Any balancing or sliding-scale test that varies with the type of witness testimony in the initial trial or the form of the claim in the later collateral action would guarantee the vexatious litigation that the privilege was designed to prevent.

The cases offered by the appellants as support for a claim-specific balancing approach do nothing to advance their argument. The decision of the Maryland state court in *Adams*, for instance, actually expanded immunity to statements made "for possible use in connection with a pending judicial proceeding." *Adams v. Peck*, 415 A.2d 292, 292 (Md. 1980). This circuit reached a similar conclusion in *Mangold*, finding that the common law immunity should apply to statements made by government contractors "in

14

response to queries by government investigators engaged in an official investigation." *Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1449 (4th Cir. 1996) (alterations omitted). Both cases reinforce the simple fact that state and federal courts alike are willing to invoke the common law's protections when the values that animate a historic immunity are at issue. Neither citation advances a case-by-case public policy test. To the contrary, these decisions confirm that our system requires broad protection for those who offer judicial proceedings information, unaltered by the facts of a particular case.

The statements made by Dr. Wheeler as an expert in the administrative proceeding are within the privilege's scope. This fact alone is enough to resolve the state law causes of action, which offer no basis for displacing the common law immunity. The federal claim, however, arises under statute and we must now consider whether appellants' statutory cause of action abrogates the traditional immunity afforded to witnesses under common law.

B.

Appellants' sole federal claim arises under the civil cause of action created by the Racketeer Influenced and Corrupt Organizations Act (RICO), Pub. L. No. 91-452, Title IX (1970) (codified at 18 U.S.C. §§ 1961-1968 (2012)). The Witness Litigation Privilege is a part of federal common law. Congress clearly has the power to displace common law protections by statute if it so desires. *See Pulliam v. Allen*, 466 U.S. 522, 529 (1984). Federal courts, however, do not leave this question to ordinary interpretive parsing.

15

Instead, common law immunities function as implied limits on congressional statutes, operative until they are expressly removed.

Congress frequently enacts statutes in harmony with the common law. Sometimes legislators borrow terms familiar to our common law tradition. *See, e.g.*, *Nationwide Mutual Ins. Co. v. Darden*, 503 U.S. 318, 322 (1992) ("Where Congress uses terms that have accumulated settled meaning under the common law, a court must infer, unless the statute otherwise dictates, that Congress means to incorporate the established meaning of these terms."). At other times Congress assumes that common law principles will inform the causes of action that it creates. *See, e.g.*, *Meyer v. Holley*, 537 U.S. 280, 286 (2003) (applying "ordinary background tort principles" to statutory cause of action under the Fair Housing Act). When Congress seeks to displace a common law immunity, it therefore must do so in clear terms. Absent an indication of a contrary purpose, the courts "must presume that Congress intended to retain the substance of the common law." *Kirtsaeng v. John Wiley & Sons, Inc.*, 568 U.S. 519, 538 (2013) (quoting *Samantar v. Yousuf*, 130 S. Ct. 2278, 2289-90 (2010)); *see also United States v. Texas*, 507 U.S. 529, 534 (1993). *Cf. Atascadero State Hosp. v. Scanlon*, 473 U.S. 234, 242 (1985) (requiring "unmistakably clear" language to abrogate state sovereign immunity).

The decision in *Briscoe* is instructive. In that case, the Supreme Court reasoned that 42 U.S.C. § 1983, despite its very broad statutory language, did not speak clearly enough to the question of witness immunity to displace the common law. *Briscoe v. Lahue*, 460 U.S. 325, 336 (1983). Rather than looking for an explicit preservation of the common law immunity, the Court presumed such a limitation to the statute's general

16

language, which might otherwise have been read to cover false testimony. The Court then contrasted § 1983 with another Civil War-era statute, § 1985, which was enacted to combat the "reign of terror" wrought in the South by the Ku Klux Klan. *Id.* at 337. After examining the repeated references to perjury in the legislative history and the specific reference to obstruction of justice in the statute, the Court found that § 1985 did displace witness immunity in this narrower cause of action. *Id.* at 340. In analyzing both statutes, the Court began with a strong presumption that common law immunities should only be displaced when the statute foreclosed an alternate reading.

RICO's civil cause of action manifests no intention to displace the Witness Litigation Privilege. In enacting RICO, Congress stated that "it is the purpose of this Act to seek the eradication of organized crime in the United States." Organized Crime Control Act of 1970, Pub. L. No. 91-452, § 1. To further this purpose, RICO lists a range of prohibited "racketeering activities," 18 U.S.C. § 1961, and allows for both civil and criminal enforcement. *Id.* §§ 1963, 1964. To bring a claim under the civil provision, a plaintiff must demonstrate that he is "injured in his business or property." *Id.* § 1964(c).

Rather than develop a new category of prohibited acts, RICO borrowed other provisions of the federal criminal law to define "racketeering activities." 18 U.S.C. § 1961(1). The statute cross-references various acts of witness tampering and obstruction of justice, but it does not include the criminal sanction for perjury, found at 18 U.S.C. § 1621. As the Second Circuit explained, "Congress did not wish to permit instances of federal or state court perjury as such to constitute a pattern of RICO racketeering activities, [demonstrating] an understandable reluctance to use federal criminal law as a

17

back-stop for all state court litigation." *United States v. Eisen*, 974 F.2d 246, 254 (2d Cir. 1992). Moreover, the RICO statute makes no reference to witness testimony. This is not because the issue slipped Congress' mind. The statute providing witnesses with a general "use immunity" from federal criminal prosecutions was passed as Title II of the very same law that included RICO. *See* Pub. L. No. 91-452, Title II (1970).

Given the complete absence of direction on the subject of witness immunity, as well as the explicit decision to not include perjury within the definition of racketeering activities, we cannot conclude that RICO abrogated witness immunity. As Judge Nelson wrote for the Sixth Circuit,

> Section 1983 was not intended to abolish this immunity and we have been given no reason to suppose that RICO was intended to abolish it either. It would be anomalous, we think, if officials who are immune from suit for alleged violations of the Constitution itself should be denied immunity from suit for alleged violations of a statute that does not incorporate the Constitution—particularly a statute as amorphous as RICO.

*Cullinan v. Abramson*, 128 F.3d 301, 308 (6th Cir. 1997). This is but one example of the many opinions that have rejected claims that RICO abrogated common law immunities. *See, e.g.*, *Chappell v. Robbins*, 73 F.3d 918, 919 (9th Cir. 1996) (finding that RICO does not express "a clear intent to abrogate legislators' common law immunity"); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of Ill.*, 729 F.2d 1128 (7th Cir. 1984) (finding that state legislators are immune from a federal RICO claim for legitimate legislative activities).

Appellants contend that the abrogation of common law immunities should turn on the question of whether the statute is civil, criminal, or, like RICO, a "civil-criminal

18

hybrid." App. Br. 28. But the particular nature or structure of the assertedly abrogating statute matters not. The dispositive point remains congressional intent and whatever the civil or criminal or "hybrid" nature of the statute, that intent must be clear. The point is especially salient with an issue like witness immunity when witness participation is essential in both civil and criminal proceedings. Courts have routinely addressed the question of whether a statute displaced common law protections without any suggestion that the principles of displacement varied with the nature of the statute the court was interpreting. *See Briscoe*, 460 U.S. at 333; *Cullinan*, 128 F.3d at 308.

Appellants argue, however, that RICO's cross-reference in 18 U.S.C. § 1961 to a criminal prohibition on witness tampering, found at 18 U.S.C. § 1512, creates a civil remedy for obstruction of justice generally, including acts of false testimony. This, however, would be an exceptionally oblique way for Congress to have abrogated witness immunity. Section 1512 makes no reference to false testimony or to perjury. This absence of specificity is fatal to appellants' claim because, as the Supreme Court held in *Briscoe*, the litigation privilege is "'a tradition so well grounded in history and reason' that we cannot believe that Congress impinged on it 'by covert exclusion in the general language before us.'" *Briscoe*, 460 U.S. at 334 (quoting *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). Moreover, appellants make no claim of witness tampering. Witness tampering is of course a wholly distinct offense from perjury. *Compare* 18 U.S.C. § 1641, *with* 18 U.S.C. § 1512. Witness tampering can only demean the administration of justice. There has been no common law immunity, state or federal, for those who tamper with witnesses. The witness immunity privilege, by contrast, facilitates the administration of

19

justice and it would make perfect sense for Congress in RICO to cross-reference one of those crimes and not the other.

The appellants' view finally misrepresents the intersection between RICO and the common law. With witness immunity fully intact, racketeering activities under RICO can still include acts to improperly influence witnesses, tamper with evidence, or bribe public officials.  To the extent individuals are harmed in their "business or property" by these acts, *see* 18 U.S.C. § 1964(c), they can seek redress. These claims are only limited when the injurious conduct is part of a core judicial process that the common law keeps uninhibited by the prospect of civil litigation. Common law immunities pose no general threat to RICO's effectiveness. To the contrary, RICO and witness immunity are complementary because it is that very immunity that allows RICO prosecutions and RICO civil causes of action, like all other judicial process, to proceed in an unfettered way. In other words, without the immunity, the entire RICO statute, both its civil and criminal provisions, would be impaired.

IV.

We thank our friend and colleague for his dissenting opinion, and especially for its reminder of the contribution coal miners have made and continue to make in support of our nation's welfare. The implications of our colleague's position, however, travel far beyond the coal fields, and the dissent has failed to come to grips with any of them.

All one can glean from the dissent is a deep indifference to the Witness Litigation Privilege and a willingness to abrogate that privilege to a degree that no court has before.

Certainly no standard for the application of the privilege is provided, other than some general notion that "given the nature of this civil RICO claim" the immunity does not apply "to this litigation." Diss. Op. at 30, 33. This approach leaves witnesses at sea, disregarding the Supreme Court's repeated admonition that immunities require some clarity of application to serve their intended function. *See Mitchell v. Forsyth*, 472 U.S. 511, 524-26 (1985). The omnipresent prospect of collateral proceedings inherent in the dissent's fact-intensive standard is itself enough to undermine the very purpose of witness immunity. One can envision lawyers reading the dissenting opinion and advising their witness clients that there is no way of knowing when the immunity would be abrogated and that they should be prepared for anything by way of a collateral attack upon their testimony.

The dissent only arrives at such a precarious position by misreading the Supreme Court's cases, erroneously finding both an instruction to apply witness immunity in an ad hoc manner and an invitation to conclude that witness immunity has been abrogated by the most imprecise and opaque of signals. As authority for its vague case-specific approach, the dissent relies on two cases where the Court actually *expanded* common law immunities, one to witness testimony before a grand jury, *Rehberg v. Paulk*, 566 U.S. 356 (2012); and the other to the appearance of a state prosecutor in a probable cause hearing. *Burns v. Reed*, 500 U.S. 478 (1991). *See* Diss. Op. at 29-33. Rather than reading these cases for what they are, which is simply further support for the immunity afforded to participants in judicial proceedings, the dissent instead sees in these opinions an endorsement of its imprecisely diluted version of witness immunity. On this view, the

21

immunity does not reach a witness's actions in preparation of giving testimony and is only applicable to the testimony itself. *See* Diss. Op. at 31-32. The very case relied on by the dissent, however, forecloses such a limitation. As a unanimous Supreme Court wrote in *Rehberg*, witness immunity "may not be circumvented by claiming that a . . . witness conspired to present false testimony. . . . Were it otherwise, a [] defendant turned civil plaintiff could simply reframe a claim to attack the preparation instead of the absolutely immune actions themselves." *Rehberg*, 566 U.S. at 369 (quotations omitted).

The difficulties with our friend's position regrettably do not end there. As the dissent understands it, the fact that some broad crimes included in RICO's definition of "racketeering activities"—such as mail fraud, bribery, or obstruction of justice—could conceivably reach witness conduct shows that the immunity has been abrogated in civil suits. These broad statutes, just like the open-ended language of 42 U.S.C. § 1983 at issue in *Briscoe*, fall well short of the clear statement that we are required to identify before taking such a drastic step. In concluding otherwise, the dissent ignores the Supreme Court's standard and fails to acknowledge that while the criminal and civil provisions of RICO may identify the same underlying conduct, they do not both implicate witness immunity. As the Supreme Court has recognized, the two prongs of RICO do not always have the same reach, especially where a clear statement of congressional intent is required. *See RJR Nabisco, Inc. v. European Cmty.*, 136 S. Ct. 2090, 2106 (2016) (finding that RICO's criminal provisions apply extraterritorially but its civil cause of action does not).

22

Even more disappointingly, the dissent's openness to collateral proceedings against witnesses prevents it from acknowledging that witness immunity might just serve a useful purpose or that unleashing a civil RICO claim against witnesses in the absence of any clear congressional authorization might entail a variety of adverse consequences. In particular, the dissent fails to acknowledge the incentive that disconsolate losing parties would have to go after a prevailing party's witness; the added incentive for both collateral actions and "settlement suits" that RICO's treble damages provision might inspire, *see* 18 U.S.C. § 1964(c); the rise in expert witness fees that would inevitably result for both plaintiffs and defendants in anticipation of collateral liability; the shading of testimony from lay witnesses with an eye cast toward a retributive RICO action against them for monetary damages; the reluctance generally of witnesses of all kinds to participate in judicial proceedings that newly stretch beyond the normal point of conclusion; and the weight that has been afforded for many decades, indeed centuries, to the efforts of the civil justice system to protect from post-verdict burdens the jurors (e.g., Fed. R. Evid. 606(b)) and witnesses that are the mainstay of that system and allow it to work.

Now it may well be that the above considerations would not persuade Congress in any dispute over the immunity's abrogation. But it should at least persuade us to await a clear expression of intent to abrogate longstanding common law that is wholly absent from the statute as presently written. As we have noted in some detail above, *supra* at 17-18, RICO's list of proscribed acts fails to cross-reference perjury, nor may its other provisions be read to defeat witness immunity. Congress could of course amend the statute in a pen stroke to reference acts of perjury, but it has not to date done so and we

23

cannot read into a statute what is manifestly just not there. *See United States v. Locke*, 471 U.S. 84, 95 (1985) ("[T]he fact that Congress might have acted with greater clarity or foresight does not give courts a *carte blanche* to redraft statutes in an effort to achieve that which Congress is perceived to have failed to do.").

Rather than acknowledge the protection of the Witness Litigation Privilege, appellants and our dissenting colleague offer a competing theory of witness immunity, applicable only in some cases, only for some witnesses, and only for certain acts. If a plaintiff seeks damages for a claim other than defamation, or against an expert witness who appeared voluntarily, or based on allegations of deliberate wrongdoing, then the privilege could be overcome by every judge's independent notions of good policy.

The uncertainty of the such an approach would sound the death knell of the privilege. The accumulated wisdom of so many generations of courts and jurists testifies to the value of protecting witnesses, without whom our legal proceedings would bear no more than faint resemblance to their former selves. This is not to say that every witness is the embodiment of perfect recall or integrity, but only that the alternative suggested by appellants to the existing remedies and sanctions for flawed testimony would be far worse.

V.

For the foregoing reasons, the judgment of the district court is

*AFFIRMED.*

24

KING, Circuit Judge, dissenting:

I write separately to explain my disagreement with the panel majority's decision to affirm the dismissal of the complaint. My position is predicated on two primary propositions. First, the majority's treatment of the civil RICO claim is fatally flawed and lacks supporting authority. In my view, the RICO allegations are compelling and should go forward in the district court. The majority's decision will leave America's coal miners and their families with no civil remedy for the criminal activities of Dr. Wheeler and his racketeering partners. Put succinctly, the majority has — on an ultra-thin record — unnecessarily expanded the so-called witness litigation privilege (the doctrine of "absolute witness immunity"), and then misapplied its expanded immunity principles to affirm the dismissal of the civil RICO claim. Second, notwithstanding the reluctance of federal courts to expand state law, the majority has applied its broad view of absolute witness immunity to the state law claims in the complaint and endorsed their dismissal as well. In these circumstances, I must dissent.

A.

According to the complaint — which we must accept as true — the civil RICO racketeering scheme carried on by the defendants was both sophisticated and complex.[1] It included the following:

_____

[1] In reviewing a dismissal under Federal Rule of Civil Procedure 12(b)(6), we accept the complaint's factual allegations as true and draw all reasonable inferences in favor of the plaintiffs. *See Singer v. Reali*, 883 F.3d 425, 437 (4th Cir. 2018).

25

- Wheeler and his fellow racketeers obtained B-reader accreditations under federal law, demonstrating workable knowledge of the International Labour Organization ("ILO") classification system for radiology and an ability to accurately apply it;[2]

- As B-readers, Wheeler and his coschemers knew they were obligated to interpret radiographs according to the ILO classification system;

- Wheeler and his partners in crime intentionally disregarded the ILO classification system for interpreting coal miners' radiographs for the federal black lung program, and they falsely attributed positive readings to other causes and diseases, instead of correctly reporting evidence of coal workers' pneumoconiosis;

- Wheeler has admitted that, notwithstanding his obligation to apply the ILO classification system as a B-reader, he purposefully rejected and ignored that system;

- Wheeler has asserted that he does not "care about the law," and he does not think it was appropriate for coal miners to be paid benefits just "because [miners had] masses and nodules," *see* J.A. 21;[3]

- In exchange for submitting their false and fraudulent expert opinions that miners' radiographs were negative for evidence of black lung disease — when those radiographs were actually positive — Wheeler and his racketeering associates were paid premium and excessive fees, that is, "significant sums in excess of standard x-ray review fees," *see* J.A. 34;

---

[2] Under the applicable regulations, a certified B-reader designation "means that the physician has demonstrated ongoing proficiency in evaluating chest radiographs . . . in the use of the ILO classification for interpreting chest radiographs for pneumoconiosis and other diseases." *See* 20 C.F.R. § 718.102(e)(2)(iii). A physician can achieve and maintain B-reader status "by taking and passing a specially designed proficiency examination given on behalf of or by the National Institute of Occupational Safety and Health." *Id.*

[3] Citations herein to "J.A.__" refer to the contents of the Joint Appendix filed by the parties in this appeal.

26

- Wheeler and his coconspirators used the mails to receive radiographs and to send their false and deceptive interpretations to various employer companies — including Peabody Energy and Eastern Associated Coal — their lawyers, and administrative adjudicators;

- Despite rendering and reporting roughly 1500 radiograph interpretations, Wheeler and his racketeering partners never identified the most serious and obvious form of black lung, called "complicated coal workers' pneumoconiosis," for any claimant, even when other expert physicians found complicated coal workers' pneumoconiosis in approximately 390 of those 1500 radiographs;[4] and

- In at least 280 of those cases, Wheeler and his coconspirators successfully deceived the adjudicators into erroneously determining that claimant coal miners did not have coal workers' pneumoconiosis when they, in fact, had that disease. As a result, those diseased miners were denied statutory black lung benefits to which they were entitled.[5]

## B.

The panel majority has erroneously framed the RICO claim as seeking to "punish misleading statements" or "sanctio[n] flawed testimony." *See ante* 10, 24. That gloss, however, distorts what Wheeler and his fellow racketeers actually did. These defendants were actually engaged in a RICO scheme and conspiracy — carried out through a RICO

---

[4] The complaint incorporates a report from the Center for Public Integrity, which explains that Wheeler and his coconspirators were patently incorrect about the absence of complicated coal workers' pneumoconiosis disease in nearly thirty percent of the cases they reviewed. *See* Chris Hamby et al., *Johns Hopkins Medical Unit Rarely Finds Black Lung, Helping Coal Industry Defeat Miners' Claims*, The Center for Public Integrity (Oct. 30, 2013).

[5] By their complaint, the plaintiffs seek to pursue a nationwide putative class action on behalf of all those "whose radiography were reviewed by Defendants, and were denied or lost [black lung] benefits." *See* J.A. 27.

27

enterprise — to provide false and fraudulent information to parties, their lawyers, and others involved in black lung proceedings. And that false evidence was always intended to be used to deprive sick coal miners and their families of their statutory benefits.

The panel majority's analysis of absolute witness immunity suffers from faulty assumptions and untethered generalities, resulting in at least two fatal errors.[6] First, their analysis assumes that absolute witness immunity applies to the civil RICO allegations. Second, overlooking the principles and purposes of a civil RICO cause of action — which include the deterrence of criminal fraud schemes that impede the fair and proper functioning of commercial and governmental entities — the majority erroneously concludes that the RICO statutes do not abrogate the doctrine of absolute witness immunity in the context of this RICO claim.

1.

The panel majority's decision rests upon an overly expansive definition of absolute witness immunity. To support their broad definition, their opinion relies on several decisions that address civil rights claims under 42 U.S.C. § 1983. *See ante* 7-8, 11. Importantly, its reasoning depends heavily on the Supreme Court's absolute witness

---

[6] The courts have historically utilized several nomenclatures to describe the form of immunity accorded certain witnesses for their testimony. Although the majority generally refers to such immunity as the "witness litigation privilege," that term is a poor fit here. Under the complaint, Wheeler and his coconspirators have never been witnesses in anything. Indeed, they have never presented their false and fraudulent opinions from the witness stand in any courts or adjudicative proceedings. Nevertheless, I prefer the terminology used by the Supreme Court, that is, "absolute witness immunity." *See Briscoe v. LaHue*, 460 U.S. 325, 345 (1983).

immunity decision in *Briscoe v. LaHue*, 460 U.S. 325 (1983).  The reliance on *Briscoe* and the § 1983 decisions, however, is a thin reed that overlooks the boundaries drawn by the Supreme Court with respect to immunity principles.

Thirty-five years ago, in *Briscoe*, the Supreme Court confined its application of absolute witness immunity to claims being pursued under § 1983.  The Court emphasized that "[t]he availability of a common-law action . . . is inapposite because [the plaintiffs] present only the question of § 1983 liability for false testimony during a state court criminal trial."  *See Briscoe*, 460 U.S. at 330 n.9.  In explaining the common law roots of the doctrine of absolute witness immunity, the *Briscoe* Court relied on decisions and treatises applying such immunity to defamation claims, but not to claims predicated on fraud schemes.  *See id.* at 331 & n.11.

Just six years ago, in *Rehberg v. Paulk*, the Supreme Court clarified its *Briscoe* rulings and emphasized that, at common law, absolute witness immunity applied only to defamation claims arising from testimony in judicial proceedings.  *See* 566 U.S. 356, 366-67 (2012).  The Court explained:

> At common law, trial witnesses enjoyed a limited form of absolute immunity for statements made in the course of a judicial proceeding:  They had complete immunity against slander and libel claims, even if it was alleged that the statements in question were maliciously false.

*See id*.  The *Rehberg* Court contrasted the common law construction of absolute witness immunity with *Briscoe*'s expansion of such immunity in the context of § 1983 claims.  The Court explained that "*Briscoe* . . . held that the immunity of a trial witness sued under § 1983 is broader [than at common law]:  In such a case, a trial witness has

29

absolute immunity with respect to *any* claim based on the witness' testimony." *See id.* at 367. The *Rehberg* Court then carefully analyzed the doctrine of absolute witness immunity in the context of a § 1983 claim. And the *Rehberg* decision left no doubt that the absolute witness immunity "available in § 1983 actions differ[s] in some respects from [such immunity available at] common law." *See id.* at 366. My friends of the majority, however, have ignored the Supreme Court's distinction and erroneously applied absolute witness immunity to the RICO claim pursued in this litigation.

Given the nature of this civil RICO claim, the doctrine of absolute witness immunity simply does not apply. In other words, the RICO claim is not a claim precluded by such immunity. It arises from a series of fraudulent activities in furtherance of a sophisticated plan to deprive our nation's diseased coal miners — and their families — of the black lung benefits to which they are entitled. Of great importance, the majority has not referenced any precedent of this Court or the Supreme Court that has applied absolute witness immunity against civil RICO liability. Without tethering its view of absolute witness immunity to some controlling precedent, the majority has erroneously expanded that doctrine.

In so ruling, the majority expresses its concern that, if the plaintiffs are allowed to pursue the RICO claim, that effort will somehow result in improper "gamesmanship," with plaintiffs escaping an application of absolute witness immunity by alleging claims that do "not take the precise form of a defamation action." *See ante* 13. They are simply wrong in this regard. The plaintiffs' RICO claim is not some disguised and artfully pleaded attempt to litigate defamatory conduct under a different name. The RICO claim

30

simply seeks a remedy for a statutorily outlawed fraudulent course of racketeering activity.

Specifically, the plaintiffs' RICO claim concerns Wheeler's and his coconspirators' acts of mail fraud and obstruction of justice that occurred prior to the submission of their false reports to black lung adjudicators. Even courts that have applied the more expansive principles of absolute witness immunity to § 1983 actions have recognized that such immunity does not "relate backwards" to non-testimonial acts occurring prior to testimony. *See Spurlock v. Satterfield*, 167 F.3d 995, 1001 (6th Cir. 1999) (recognizing that absolute witness immunity applies to § 1983 claims based on conspiracy to testify falsely, but explaining that such immunity does not "relate backwards" to protect acts that "ultimately lead to witness testimony"); *Gregory v. City of Louisville*, 444 F.3d 725, 739-40 (6th Cir. 2006) (reiterating that acts preceding testimony do not receive absolute witness immunity "despite any connection these acts might have to later testimony"); *see also Rehberg*, 566 U.S. at 370 n.1 (explaining that, although absolute immunity extends to grand jury witnesses, such immunity does not "extend to *all* activity that a witness conducts outside" of giving testimony); *Lisker v. City of Los Angeles*, 780 F.3d 1237, 1242-43 (9th Cir. 2015) (concluding that claims based on non-testimonial documents prepared in anticipation of testimony are not protected by absolute witness immunity). Contrary to those decisions, the majority has expanded absolute witness immunity to cover racketeering activities prohibited under the RICO statutes.

31

Moreover, the rationale for according absolute witness immunity to defamatory statements does not apply to the racketeering activities — mail fraud and obstruction of justice — underpinning this civil RICO claim. Although exposing witnesses to defamation claims might cause them to be reluctant to testify (for fear of liability) or to distort testimony when they do, those concerns are not applicable here. *See Briscoe*, 460 U.S. at 333. On the contrary, these defendants were engaged in extensive and sophisticated racketeering activities to provide false and misleading information (i.e., false reports) about medical records of black lung claimants to the parties, lawyers, and federal administrative bodies involved in black lung proceedings. In that setting, the foregoing concerns are simply not implicated. We therefore should not — and need not — expand absolute immunity to RICO claims.[7] As the Supreme Court has emphasized, the courts are obliged to be "'quite sparing' in [their] recognition of absolute immunity," and the Court has "refused to extend it any 'further than its justification would warrant.'" *See Burns v. Reed*, 500 U.S. 478, 486-87 (1991) (citation omitted).

---

[7] My friends unfortunately mischaracterize my position — that absolute witness immunity does not apply here — as having "no standard." *See ante* 21. As they seek to explain it, my position is predicated on "some general notion" about the civil RICO claim that results in a "vague case-specific approach." *See id*. To the contrary, the standard I espouse is quite simple: If criminals participate in a scheme to create false and fraudulent expert witness reports intended to deceive an adjudicative body, and if they engage in racketeering activities to further that fraud scheme, they will not be shielded by the doctrine of absolute witness immunity. In other words, those schemers are not legitimate expert witnesses. They are simply criminals posing as expert witnesses, and in that circumstance are not entitled to absolute immunity. To allay any concern about this standard, lawyers hiring expert witnesses — including lawyers opposing black lung claimants — need only instruct their prospective experts not to violate the law.

Despite the inapplicability of the rationale underlying absolute witness immunity to this litigation, the panel majority also asserts that permitting the RICO claim to go forward would "undermine the truth-seeking function" of adjudicative bodies. *See ante* 11. I am unable to fathom how the conspiratorial use of false and fraudulent expert reports — intended to mislead coal miners, coal companies, lawyers, and adjudicative bodies — can in any way contribute to the "truth-seeking function" of the adversarial process. Contrary to the majority's contention that permitting the RICO claim to proceed would distort the evidentiary process, it was Wheeler and his fellow racketeers who purposefully supplied falsehoods and misrepresentations about medical records in a concerted and repugnant effort to skew the adjudicatory outcomes of claims lodged by hundreds of coal miner victims. Those distortions should neither be sanctioned nor encouraged by the courts. Just as muddy water does not become clear with the addition of more dirt, adjudicatory proceedings to determine the truth will never be aided by the addition of intentional falsehoods and deceptions.

In 1991, the Supreme Court directly instructed the courts to "sparing[ly]" apply the doctrine of absolute immunity. *See Burns*, 500 U.S. at 486-87. And our Court has heeded that admonition. We have heretofore only applied such immunity, as afforded to witnesses, "to the extent necessary to serve the greater public interest." *See Mangold v. Analytic Servs., Inc.*, 77 F.3d 1442, 1449 (4th Cir. 1996).[8] Our friends in the majority

---

[8] Unfortunately, the panel majority has today expanded absolute witness immunity to an entirely new class of recipients — those expert witnesses who write false reports, but who never actually testify in any courts or adjudicative proceedings. This new class (Continued)

have today eschewed those directives. Awarding absolute immunity to these defendants — on a Rule 12(b)(6) motion — for an unabashed fraud scheme that has disrupted the black lung adjudicative process at the expense of diseased and deceased coal miners, as well as their beneficiaries, does not in any way serve the "greater public interest."

## 2.

The panel majority also mistakenly concludes that the RICO statutes do not abrogate the doctrine of absolute witness immunity in this setting. To suggest that Congress did not intend to abrogate such immunity in the RICO context, however, ignores both the text and purposes of the RICO statutes. First of all, RICO broadly punishes false statements given under oath. *See* 18 U.S.C. § 1961 (incorporating 18 U.S.C. §§ 1425, 1542); *see also* 18 U.S.C. § 1542 (prohibiting false statements made for passport applications); *Maslenjak v. United States*, 137 S. Ct. 1918, 1931 (2017) (explaining that materially false statement given under oath may violate § 1425). Thus, Congress has demonstrated its clear intention to curtail false statements under oath through RICO proceedings.

---

of absolutely immune experts, however, today joins those public officials who have traditionally and properly been accorded absolute immunity by our judicial system, that is, legislators, judges, prosecutors, and the President. And those public officials are only protected by absolute immunity in those circumstances where they perform their official duties. Unlike the absolute immunity protecting such public officials, today's unwarranted extension of absolute immunity to criminal fraud schemes committed by so-called expert witnesses in no way "serve[s] the greater public interest." *See Mangold*, 77 F.3d at 1449.

Second, the panel majority's broad interpretation and application of absolute witness immunity contradicts and undermines Congress's desire to punish those involved in racketeering activities. The plaintiffs predicate this civil RICO claim upon, inter alia, multiple acts of mail fraud and obstruction of justice.[9] Congress has specifically provided that "any act which is indictable under . . . section 1341 (relating to mail fraud)" constitutes racketeering activity. *See* 18 U.S.C. § 1961(1)(B). A mail fraud crime under § 1341 involves using the mails to execute a scheme to defraud another with false statements or representations. *See United States v. Wynn*, 684 F.3d 473, 477-78 (4th Cir. 2012) (identifying elements of mail fraud). The plaintiffs allege that Wheeler and his racketeering partners contravened § 1341 by utilizing the mail system to prevent diseased coal miners and their families from receiving the black lung benefits they are due. And the defendants did so by falsely and fraudulently representing that Wheeler and his partners in crime had made radiograph interpretations that complied with the ILO classification system. The majority's decision to authorize Wheeler and his fellow racketeers to escape liability is directly counter to the clear statutory text of RICO, which attaches civil liability to the defendants — for treble damages — to compensate these plaintiffs for the defendants' racketeering activities.[10]

---

[9] RICO requires the plaintiff to prove, inter alia, "a pattern of racketeering activity," which must include "at least two acts of racketeering activity," occurring within ten years of each other. *See* 18 U.S.C. § 1961(5).

[10] The majority's application of absolute witness immunity likewise subverts other provisions of RICO. RICO prohibits receiving and accepting bribes for the purpose of influencing sworn testimony. *See* 18 U.S.C. § 1961 (incorporating 18 U.S.C. (Continued)

In addition to undermining the statutory text, the panel majority misapprehends the strong and compelling public interest supporting the use of a civil RICO claim in the federal courts. The majority contends that the prospect of a perjury prosecution will deter witnesses from knowingly making false statements. They also say that, because RICO does not reference the perjury statute, Congress neither intended for RICO to cover false testimony nor explicitly abrogated the doctrine of absolute witness immunity. But Congress created the civil RICO cause of action to provide aggrieved individuals — like these diseased and deceased miners and their suffering families — with a civil remedy for racketeering activities. *See Sedima, S.P.R.L. v. Imrex Co.*, 473 U.S. 479, 487 (1985) (discussing Congress's decision to provide civil RICO remedy for those wronged by racketeering activities). Thus, in Congress's judgment, if the defendants engage in racketeering conduct encompassed by the RICO statutes, the criminal consequences alone neither sufficiently punish nor suffice to deter the perpetrators. *See* Organized Crime Act of 1970, Pub. L. No. 91-452, 84 Stat. 922, 923 (1970) (emphasizing Congress's finding that racketeering activities lead to "subver[sion] and corrupt[ion of] our democratic processes" and explaining purpose of RICO legislation to provide greater

---

§ 201(b)(4)). According to the majority, absolute witness immunity would bar an aggrieved litigant from pursuing a civil remedy against a witness who violates § 201(b)(4) by receiving funds in exchange for false testimony. *See* 18 U.S.C. § 201(b)(4) (prohibiting witness from receiving something of value in exchange for influenced sworn testimony). Such a result, however, directly contradicts RICO's authorization of civil recourse against those who engage in racketeering activities. *See* 18 U.S.C. § 1964.

sanctions and remedies to combat those efforts). Nor does a criminal RICO prosecution properly compensate the victims of racketeering activities. *See* 18 U.S.C. § 1964(c) (permitting recovery of treble damages in civil RICO case). Those are sound purposes — all in the "greater public interest" — for civil RICO liability that is predicated on racketeering activities.

When a RICO scheme involves statutorily prohibited racketeering activities, the fact that the scheme includes the use of perjury does not serve as a bar to civil RICO relief. *See Town of Kearny v. Hudson Meadows Urban Renewal Corp.*, 829 F.2d 1263, 1269 (3d Cir. 1987) (concluding that perjured testimony can constitute "part of the pattern of racketeering activity"). One of the decisions relied on by the majority — *United States v. Eisen*, 974 F.2d 246 (2d Cir. 1992) — shows that a RICO claim is not undermined when perjured testimony is part of the racketeering activity. From that Second Circuit decision, the majority relied on language that said "Congress did not wish to permit instances of . . . perjury . . . to constitute a pattern of RICO racketeering activities." *See ante* 17 (quoting *Eisen*, 974 F.2d at 254). My friends have failed, however, to fully assess this Second Circuit *Eisen* excerpt. The relevant portion of *Eisen* — two sentences immediately following the one relied on by the panel majority — says this:

> Nevertheless, where, as here, a fraudulent scheme falls within the scope of the federal mail fraud statute and the other elements of RICO are established, *use of the mail fraud offense as a RICO predicate act cannot be suspended simply because perjury is part of the means for perpetrating the fraud*. We do not doubt that where a series of related state court perjuries occurs, it will often be possible to allege and prove both a scheme to

37

defraud within the meaning of the mail fraud statute as well as the elements of a RICO violation.

*See Eisen*, 974 F.2d at 254 (emphasis added). I fully endorse the Second Circuit's view. It is thus apparent that the majority has misconstrued *Eisen*, which confirms that, although an act of perjury alone may not support a RICO claim, the use of perjured testimony — as part of the larger pattern of racketeering activity — will not undermine a civil RICO claim. *See id.*

Instead of permitting Wheeler and his racketeering partners to jump through an absolute immunity loophole, the RICO statutes render them civilly accountable for racketeering activities committed in furtherance of the civil RICO claim. The fact that the RICO claim involves false and fraudulent opinions and reports from Wheeler and his partners in crime does not entitle them to escape liability for using their expertise to prevent our hardworking coal miners from receiving black lung benefits that they are legally due. By barring the plaintiffs from pursuing their civil RICO claim, my good colleagues of the panel majority frustrate the proper use of the RICO statutes in civil proceedings such as this, and undermine the mandate "to serve the greater public interest" and the due administration of justice.

## C.

The panel majority is also wrong with respect to the plaintiffs' state law claims. The majority presupposes that it is within our province to expand Maryland state law immunity principles to bar those claims as well. It is entirely inappropriate, however, for

us to do that.[11]  *See Washington v. Union Carbide Corp.*, 870 F.2d 957, 962 (4th Cir. 1989) ("Federal courts are permitted under *Erie R.R. Co. v. Tompkins*, 304 U.S. 64 . . . (1938) . . . to rule upon state law as it presently exists and *not to surmise or suggest its expansion*." (emphasis added)); *see also Johnson v. Collins Entm't*, 199 F.3d 710, 723 (4th Cir. 1999) ("[T]he state system does possess greater competence than the federal courts to decide questions of state law impacting state public policy.").

In any event, the panel majority has failed to properly analyze and apply the controlling Maryland legal principles.  The Maryland courts are obliged to determine whether absolute witness immunity applies to testimony in administrative proceedings "on a case-by-case basis."  *See Offen v. Brenner*, 935 A.2d 719, 722, 731 (Md. 2007). And under Maryland law, "whether absolute witness immunity will be extended to any administrative proceeding . . . in large part turn[s] on two factors:  (1) the nature of the public function of the proceeding and (2) the adequacy of procedural safeguards which will minimize the occurrence of *defamatory statements*."  *See id.* at 722 (emphasis added) (internal quotation marks omitted) (quoting *Gersh v. Ambrose*, 434 A.2d 547, 551-52 (Md. 1981)).  In addition to failing to identify and employ the applicable test, the majority does not appreciate the damage that the "greater public interest" will suffer when these so-called expert witnesses are accorded absolute immunity.  *See Odyniec v.*

_____

[11] If we were to remand the state law claims, the district court would be entitled to certify an unresolved controlling question to the high court of Maryland regarding the applicability of absolute witness immunity to the state law claims.  *See* Md. Code Ann., Courts and Judicial Proceedings, § 12-603 (permitting Court of Appeals of Maryland to answer "a question of law certified to it by a court of the United States").

*Schneider*, 588 A.2d 786, 791 (Md. 1991) (explaining that Maryland courts will not extend absolute witness immunity unless balancing of competing interests compels immunity award). Because of the majority's unwarranted expansion of absolute witness immunity under Maryland law, I also dissent on the state law claims.

## D.

Pursuant to the foregoing, I would vacate the district court's dismissal of the complaint, reinstate its five alleged claims, and remand for such other and further proceedings as may be appropriate.[12]

I therefore respectfully dissent.

---

[12] If we remanded, I recognize that there would likely be issues presented — heretofore raised but not addressed by the district court — regarding the legal sufficiency of the RICO claim. Those issues need not be decided in this appeal, but should be confronted and resolved by the district court in the first instance.